# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK, COUNTY OF NEW YORK

| | |
|---|---|
| CANDICE LUE, an individual, | CASE NO. 16 CV 3207 |
| Plaintiff, | |
| V. | COMPLAINT FOR: |
| JPMORGAN CHASE & CO., a Delaware Corporation; ALEX KHAVIN, an individual; FIDELIA SHILLINGFORD, an individual; JOHN VEGA, an individual; HELEN DUBOWY, an individual; PHILIPPE QUIX, an individual; THOMAS POZ, an individual; CHRIS LIASIS, an individual; MICHELLE SULLIVAN, an individual; and DOES 1 - 10, inclusive, | **(1) UNLAWFUL DISCRIMINATION ON THE BASIS OF RACE;** |
| | **(2) UNLAWFUL RETALIATION;** |
| | **(3) AIDING AND ABETTING TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 VIOLATIONS;** |
| Defendants. | **(4) UNLAWFUL HARASSMENT ON THE BASIS OF RACE;** |
| | **(5) FAILURE TO PREVENT DISCRIMINATION, RETALIATION AND HARRASSMENT;** |
| | **(6) INTENTIONAL INFLICTION OF CAREER REGRESSION AND CAREER STAGNATION ON THE BASIS OF RACE;** |
| | **(7) INTENTIONAL AND/OR NEGLIGENT INFLICTION OF MENTAL, PHYSICAL AND EMOTIONAL DISTRESS;** |
| | **(8) UNLAWFUL SEGREGATION;** |
| | **(9) UNWILLINGNESS/FAILURE TO PROMOTE TO A MANAGERIAL POSITION ON THE BASIS OF RACE; AND** |
| | **(10) DEFAMATION OF CHARACTER ON THE BASIS OF RACE;** |
| | **DEMAND FOR JURY TRIAL** |

This action is brought for discrimination in employment pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

I, Candice Lue ("Candice Lue"), Plaintiff, allege against Defendants JPMorgan Chase & Co. ("JPMorgan Chase"), Alex Khavin ("Khavin"), Fidelia Shillingford ("Shillingford"), John Vega ("Vega"), Helen Dubowy ("Dubowy"), Philippe Quix ("Quix"), Thomas Poz ("Poz"), Chris Liasis ("Liasis"), Michelle Sullivan ("Sullivan") and DOES 1 through 10, inclusive (collectively "Defendants") as follows:

## STATEMENTS OF CLAIM

1.    I, Candice Lue, Plaintiff, worked for JPMorgan Chase & Co. for three years and four months and throughout my tenure, even though I had naively dismissed circumstances that I now realize are consistent with the culture of racial bias against Blacks at JPMorgan Chase, my experience of racial discrimination at the hands of my ex skip level manager, Defendant Alex Khavin was so blatant that even in my worst state of naïveté, her bigotry was impossible for me to overlook or to ignore.

2.    The first time it became fully apparent to me that I was being racially discriminated against by way of disparate treatment by Khavin was on January 21, 2015.  On January 26, 2015, I officially raised this issue of racial discrimination against me to my then direct manager, Fidelia Shillingford then subsequently and consistently both verbally and/or in writing to Defendants Khavin, Shillingford, Vega, Poz, Quix and to the Global Head of HR, John Donnelly and up to January 6, 2016 (my retaliatory termination date), the issue was never rectified but only ignored, aided, abetted, enforced, shooed away and/or dismissed by these said named – Bearing in mind that

## COMPLAINT

January 6, 2016 was four months after a copy of my charge was served on JPMorgan Chase by the Equal Employment Opportunity Commission.

3.    Khavin's bigotry was against Blacks.  Her racist acts were consistent with disparate treatment of Blacks, segregation of Blacks as it related to manager/employee relationship and her unwillingness/failure to promote a Black employee to a position of management (see more on the latter two discriminatory acts in the 8th and 9th Causes of Action - "Unlawful Segregation" and "Unwillingness/Failure to Promote to a Managerial Position on the Basis of Race" sections).

4.    As the only Black Analyst in the Counterparty Risk Group, reminiscent of the 1800s plantation style living, in the era of slavery when Blacks had to serve their masters and their masters' families, Khavin who was an Executive Director and Head of the Counterparty Risk Group for Global Investment Management at JPMorgan Chase & Co. treated me as if I was the house slave for the non-Black members of the group.  The group consisted of two Blacks, (myself and my manager, Shillingford) and everyone else was either White or Asian.

5.    Khavin humiliatingly assigned me the task of printing, collating, stapling and lugging to the group's monthly meeting, the presentation materials of each of the non-Black team members – duties that as an analyst were not listed in my job description or aligned with my regular duties (see "Factual Allegations - C # 58" or Exhibit H).  As if I were the house slave, instead of the non-Black members of the team clicking the print button on their computers, going to the printer, picking up their printed materials, making sure that the pages are in order and binding them together with a stapler, Alex Khavin directed that each member of the team should send their presentation materials to me and I must be the one clicking on the print button, collating their presentation materials, stapling them, then on my own, lugging all of these printed materials to the monthly meetings where the non-Black team members, even the ones on my job level, would be waiting to be served. Just like in the plantation style living era when the house slave cooked the dinner, set the table then took the food to the table where the White master and his family would be waiting to be served.

**COMPLAINT**

Bearing in mind that I was an Analyst and there was a White Administrative Assistant on staff to whom these tasks were not assigned. Worst yet, these tasks did not directly or even indirectly benefit the department or JPMorgan Chase as a whole. The only people who were benefiting from these tasks being assigned to me were the non-Black team members which also included the team members who were analysts like myself.

6.    In addition to the printing, collating, stapling, etc., Khavin also decided that it was too much work for the non-Black employees to be going through their emails searching for attached presentation materials sent by each team member. So, to make it *"easier"* (Khavin's own word) for them, as if I were the house slave, she ordered that I, yes, solely me, must open each email sent, pull the attachments, put all the attachments together in one email then send this email to the team. So, it was too hard or too much work for everyone (including the non-Black analysts on my level) to search through their emails for the sent documents and print them for themselves but for me, along with the printing, etc. of everyone's documents times 13 (a copy for each team member), I must not only search through my emails for the sent documents, I must open each email sent, pull the attachments, put all those attachments together in one email and send to the team to make it *"easier"* for the non-Black members of the team. So what would become easier for the non-Black members of the team would become three times harder for me. I was made to feel as if I shared the same sentiment as a house slave working on a plantation. And, as someone of slave ancestry, I found this unessential (as it related to benefiting the department or the company as a whole) assignment demeaning and degrading.

7.    The aforementioned tasks were tasks that the non-Black employees had always done for themselves during the two years prior to me joining the team. Furthermore, Khavin had never assigned these tasks to any one of the six non-Black analysts and/or associates to do whether exclusively or on a rotational basis because she did not want to demean any of them by making it seem as if it was the task of any one of them or to make the work easier for some and harder for one.

**COMPLAINT**

But, in her act of disparate treatment against Blacks, Khavin assigned these tasks to me, an analyst as well, as solely my job to do.

8.     For two years prior to me joining the team, Khavin had made the taking of the minutes for the monthly meeting rotational among the six non-Black analysts and associates in the group as again, she did not want to demean any of them by making it seem as if it was the task of any one of them. But again, in her act of lack of respect and disparate treatment against Blacks, Khavin assigned the task of taking the minutes for the monthly team meeting to me, an analyst as well, as solely my job. And, she did this without regard to the fact that because of the nature of my job, I had up to three presentations to make at these meetings which was more than any of the other team members had to do. I had to be stopping between my presentations to answer questions as well as to take meeting minutes when on occasions there was an analyst(s) and/or associate(s) who had **no** presentation to make. So, with me having up to three presentations to make at these monthly meetings, only someone with a bigoted conscience like Khavin would see it fit to assign me, and solely me the less than palatable and undesirable tasks of taking the meeting minutes and to print, collate, staple and lug the presentation materials of **everyone** on the team for these monthly meetings. (EXHIBIT A – EEOC Intake Questionnaire – Question # 6 – Pages 2 & 3.)

9.     In a meeting with Khavin on April 24, 2015, I tried my best to articulate to her how I felt about her treating me *"as if I am the help and as if this is 1910"* and her "how dare you" response to me, *"it is your job and I expect you to do it. If you need help go and ask the [White] administrative assistant to help you"* was condescending, unapologetic and unrepentant. Khavin's response was also evidence of the disparity in how she treated me versus how she treated the other six non-Black analysts and associates in the group. Khavin refused or failed to instruct me to ask any help of the non-Black analysts in my own job category or on my same job level. However, she, in her act of lack of respect and disparate treatment against Blacks instructed me to go and ask the White

administrative assistant to help me, an analyst, to do a task that would more likely fall into the administrative assistant job category.

10.    It is ironic to note that at the time, Khavin was serving as a "Culture Lead/Culture Ambassador" for JPMorgan Chase's Culture and Conduct Program which covers diversity and inclusion within the company. Thus, she should have been more sensitive in dealing with the issue I brought before her. (Exhibit B gives a synopsis of the racial discrimination I was experiencing at the hands of Khavin and in her May 27, 2015 email response to me, her being condescending, unapologetic and unrepentant.)

11.    To further prove the point that Khavin had never and would have never assigned the task of the printing, collating, etc. of everyone on the team's meeting presentation materials to any of the non-Black analysts and/or associates, for the February 2015 monthly meeting, I was away at a mandatory two week Asset Management Training Program and no other analyst or associate was asked/told to collect and print out, etc. everyone's presentation materials for the meeting. They all printed, collated, stapled and lugged their own presentation materials to the meeting for themselves. It was as if, **the help** is out so you all have to print, collate, staple and bring your own presentation materials to the meeting.

12.    The fact that in my absence, no other analyst and/or associate was asked/told to do the printing, collating, stapling and lugging of everyone on the team's presentation materials demonstrates that this task was not directly or indirectly beneficial to the department or to the company as a whole. But rather, was only a benefit/perk for the non-Black members of the team at the expense of me, the only Black analyst on the team. A benefit/perk, that like a Black plantation house slave, I would never have had the opportunity to enjoy.

13.    Khavin giving me, the only Black analyst on the team a task that was only beneficial to or was only a perk for the non-Black members of the team was shameful, insensitive and frankly racist,

especially since this task was not asked of or had never been asked of any of the other non-Black analysts and/or associates or even the White administrative assistant on the team to do.

14. There was no other reason besides Alex Khavin's bigotry against Blacks to explain this disparity. Having graduated Summa Cum Laude from college and having seven years of Finance work experience, like everyone else, I met the education and experience requirements for the job. It was not like I had more time on my hands than the non-Black analysts because, because of the overwhelming amount of work that my job entailed, for more than half of the month my average time to leave work was 8:00 to 8:30 pm (a few times after 9:00 pm) and for the rest of the time, there was a possibility, not a guarantee, that I would get to leave between 6:00 and 6:30 pm (extremely rare for 6:00 pm) when the average time for the whole month for the non-Black analysts and associates to leave work was between 5:00 and 5:30 pm with a 6:00 pm late evening. It could not have been that it was because I was the last one to join the team because a non-Black analyst joined the team just one week before I did, two more non-Black analysts joined the team in August 2015, nine months after I did, another non-Black analyst joined the team in September 2015, ten months after I did and these clerical tasks were still assigned solely to me (EXHIBIT K).

15. I had complained about this disparate treatment against me verbally, in emails and/or both to Defendants Fidelia Shillingford, my then direct manager, a Vice President at JPMorgan Chase, Alex Khavin (the main perpetrator), an Executive Director and Head of the Counterparty Risk Group for Global Investment Management at JPMorgan Chase and John Vega, the HR representative who was an Executive Director at JPMorgan Chase, an attorney by profession and the person to whom my racial discrimination claim was escalated for an "investigation", Philippe Quix, Khavin's direct manager who was the Global Investment Management Chief Risk Officer/Managing Director when I copied him on an email dated May 27, 2015 (EXHIBIT B) and John Donnelly, a high level JPMorgan Chase executive with the title, Head of Human Resources/Executive Vice President, who became aware of my racial discrimination complaint when I copied him on an email dated August 3,

2015 (EXHIBIT C) in which I complained about being retaliated against for complaining about racial discrimination against me but to no avail. Please take note that John Donnelly reported directly to Jamie Dimon, JPMorgan Chase's Chairman and CEO.

16.     I was literally ignored by the two most senior people, John Donnelly and Defendant Philippe Quix. The HR representative, Executive Director, attorney by profession and Defendant, John Vega who did an "investigation" after the matter was escalated to him, told me that his "investigation" had found *"nothing discriminatory"* and with the same intensity as Alex Khavin and in reminiscence of the 1800s plantation style living when slaves were ordered by force, he vehemently ordered me saying, *"when it comes time to get everything ready for the monthly meeting, get it* [the printing, collating, stapling, lugging, times 13 of the non-Blacks' presentation materials] *ready so as not to derail your career here* [JPMorgan Chase]". Vega also pretty much told me that I was lucky to have had the job when he emphatically stressed my "ungratefulness" for complaining about racial discrimination against me. This "ungratefulness" included the opportunity *"working at JPMorgan Chase"*. Notwithstanding the fact that I had all the credentials required for the job - the experience, the education (strong academic performance with coursework in Economics, Statistics and Finance) and the ability to competently represent those said credentials in the six interviews I had to do to get the job which for three months prior to me applying for it, the team could not find a suitable candidate to go beyond, possibly, the second round of interviews. How racially stereotypical to think that because I took a stance against racial discrimination while *"working at JPMorgan Chase"*, I was being "ungrateful".

17.     The failure and negligence of JPMorgan Chase's employees who were in a position to take corrective actions against racial discrimination shows that disparate treatment against Blacks is condoned and ratified by JPMorgan Chase, its HR department, its senior level executive and senior level manager, John Donnelly and Defendant Philippe Quix respectively.

**COMPLAINT**

18. Defendant Shillingford who was my direct manager is Black and had engaged in horizontal racism. Whereby, to secure her job, she not only turned a blind eye to racial discrimination against me, a member of her own race but she engaged in and enforced it for her own benefit. With that said, she became the enabler, the facilitator, the coordinator and the enforcer of the racist treatment that Alex Khavin had meted out to me. Khavin used Fidelia Shillingford as cover to extend her bigotry against Blacks to me while intentionally preventing Shillingford from being promoted to a managerial position on the basis of Shillingford's said Black race (see more on this in "Ninth Cause of Action - Unwillingness/Failure to Promote to a Managerial Position on the Basis of Race").

19. One example of Shillingford's blatant horizontal racism was when I had a family emergency (my mother had an accidental fall and was incapacitated for 10 days) and on the day after the incident, I sent an email to the team telling them that due to a family emergency I had to work from home that day. Alex Khavin directed Shillingford to tell me that unlike the other non-Black analysts who could just send an email to the team saying, "I am not feeling too well today so I will be working from home" or for whatever reason they had to work from home (EXHIBIT L), I had to send Shillingford an email letting her know my situation and asking for permission to work from home (permission which would have to come from Khavin herself) and she, Shillingford would communicate accordingly to the team. Even though Shillingford knew that I was being treated at a double-standard by Khavin, she still enforced Khavin's racial discrimination and disparate treatment against Blacks, against me. Shillingford, upon the directive of Khavin, disapproved of my decision to work from home and I was further told that if I wanted to not come into the office any day to help to take care of my mother, I would have to use my vacation or my own sick days to do so. None of the non-Black analysts and/or associates was ever treated like this or given this directive in the two years prior to me joining the team or up to the time of this incident.

20. Shillingford's behavior and attitude in enforcing Khavin's bigotry against me was reminiscent of the epitome of being a "slave master's pet" in the era of slavery. Her behavior and

**COMPLAINT**

attitude were that of a slave that his master had found favor with to carry out the lashing, etc. of the other slaves on the slave master's behalf. As the automatic second reviewer of my work, mainly because I took a stance against her enforcement of Khavin's bigotry against Blacks, against me, Shillingford's reaction to finding even just one error or omission in my work was always rancorous and condescending. (More in Second Cause of Action - "Unlawful Retaliation on the Basis of Race in Violation of Title VII of the Civil Rights Act of 1964".)

21.     From the first day I joined the team, I did not only notice Shillingford's "yes, yes, master-subordinate" behavior when communicating with Khavin but I was perturbed by it. Shocked, I was questioning myself, "why is she behaving like that?" So, accepting a relationship like that with Khavin, Shillingford apparently thought that I would have accepted the same with her as my manager. In a one on one I had with Shillingford on December 17, 2014, a little over a month of me joining the team, I had an open discussion with her whereby I told her about her condescending style of management. Referring to myself as a "millennial", I let her know that unlike years and years ago when workers used to accept condescending treatment from their bosses without saying anything, millennials don't just accept that, "we speak up". Her response to me was, "*I don't have time to re-word. Sometimes when Alex* (Khavin) *comes to my desk she talks to me condescendingly.*"

22.     When from her office Khavin called Shillingford like how Cinderella's step-mother called Cinderella, Shillingford got up and ran to her. "*Yes, Yes. Yes Alex. You got it Alex.*" I had never heard Khavin call any of the other non-Black employees in that manner. So, it was obvious that Shillingford's horizontal racism against me was also motivated by the fact that since her as a Black person, in her opinion, had to accept racially charged second class treatment from Khavin, I, also a Black person, should be made to accept it as well.

23.     For the aforesaid reasons, I had asked HR to remove Shillingford as my direct manager but in their intent to aid and abet violations of Title VII of the Civil Rights Act of 1964, they ignored

my request. Shillingford was not removed as my manager because that would mean that I would have to report to a White manager. And, since the White manager did not enforce disparate treatment against the non-Black employees who reported to her, it would have been way too obvious for her to enforce Khavin's bigoted and disparate treatment against Blacks against me alone. So, Shillingford who is Black and who was willing to horizontally, as it related to race, enable, facilitate, coordinate and enforce Khavin's bigoted and disparate treatment against me, stayed as my manager.

24. Alex Khavin was a master at subtly covering her bigotry. In addition to using Black employee, Shillingford, as cover to carry out her bigotry against Blacks and her serving as a "culture lead/culture ambassador" for JPMorgan Chase's Culture and Conduct Program which covers diversity and inclusion within the company, she had also gone as far as to blatantly use the law of the State of New York as cover to engage in bigotry. In the meeting I had with her on April 24, 2015 in which I told her how I felt about her treating me "*as if I am the help and as if this is 1910*", a part of her condescending, unapologetic and unrepentant response to me was, "*I can give you anything I want to give you to do.*" Even though there might be some interpretive truth to that as it relates to the "at will" law in the State of New York, the law was not meant to be used to intentionally demean anyone or for a bigot like Alex Khavin to use it as cover to carry out her bigoted agenda. The assumed "*I can give you anything I want to give you to do*" interpretation of the law actually meant well whereby in the face of adversarial confrontations, e.g. a strike by the unionized workers at Con Edison, the company would still be able to maintain **essential** services by utilizing any and all non-unionized workers regardless of level or position to carry out work that, if left undone could or would be detrimental to consumers or to the State as a whole. The law was not meant to give a racist like Khavin the authority to harass me on a monthly basis, based on my race, to give me **unessential** tasks to do, based on my race or to make me, based on my race, be the perk for the non-Black members of the team she manages as this kind of use is unlawful pursuant to Title

**COMPLAINT**

VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin) as it relates to disparate treatment based on race.

25. In the said meeting with Khavin on April 24, 2015, she accidentally blurted out to me, "*you are not an analyst!*" Then there was a surprise look on her face as she came to grips with what she had just said then she mumbled "*you are a reporting analyst*" (see my job description as well as the other analysts' job description in "Factual Allegations – C" or EXHIBIT H – dated 10/29/2014). Clearly, Khavin had blurted out something that should have only been shared between her and her imaginary friend, her psyche. It was obvious that Khavin's bigotry against me, based on my race, was deep-seated whereby she saw me in a lesser light than the other analysts in the group or as a second class to them. In the said meeting, however, she unmistakably managed to tell me that "*there are plenty of other jobs out there*."

26. The racist culture against Blacks at JPMorgan Chase was far-reaching. As, just like Khavin and Shillingford, my two managers in a previous department, Defendant Liasis who is a racist and his help in executing his racist agenda, Defendant Sullivan were the epitome of the racist culture against Blacks that exists at JPMorgan Chase. Besides disparate treatment against Blacks, Liasis and Sullivan epitomized the intentional infliction of career regression and career stagnation and defamation of character on the basis of race (see Sixth and Tenth Causes of Action – "Intentional Infliction of Career Regression and Career Stagnation" and "Defamation of Character" on the Basis of Race in Violation of Title VII of the Civil Rights Act of 1964).

27. However, during my tenure with Liasis and Sullivan as my managers, as I stated in # 1, "*I had naively dismissed circumstances that I now realize are consistent with the culture of racial bias against Blacks at JPMorgan Chase*". I was so naïve that in an email with an attached complaint about my former manager, Defendant Sullivan, that I sent on January 12, 2015 to Julie Johnson, a Managing Director who reported directly to the afore-mentioned John Donnelly, Head of Human Resources, referring to Sullivan and Liasis' treatment against me, I said, "*To this day, I cannot*

*figure out what these two individuals have against me.  However, I am/was not the only one they had/have treated this way.*"  (EXHIBIT D – End of page 1).  Sullivan and Liasis had actually rendered the same treatment to two of my former Black co-workers.

28.     The fact of my naïveté was, as a naive college student/graduate, I dreamed of one day working at JPMorgan Chase, a company that purports itself as being committed to diversity and inclusion on its website and in its Code of Conduct policy.  And, a company where I thought I would have gotten the opportunity to work with influential, respectable and smart people who would be instrumental in the guidance and development of my financial career irrespective of my race; not a company that condones and ratifies racial discrimination including disparate treatment, defamation of character and the intentional infliction of career regression and career stagnation by its managers on the basis of race.

29.     Being of the Black race at JPMorgan Chase, unlike our non-Black counterparts, our potential is not maximized or supported by managers but rather, it is not only **intentionally** minimized or put on "lockdown" but at times ridiculed.  Sadly, working at JPMorgan Chase, I experienced all three, minimized, locked down and ridiculed at the hands of managers, Sullivan, Liasis, Shillingford and Khavin.  (See Sixth Cause of Action – Intentional Infliction of Career Regression and Career Stagnation on the Basis of Race in Violation of Title VII of the Civil Rights Act of 1964.)

30.     I strongly believe that these kinds of disparate treatment contribute to the cause whereby bright and ambitious Black employees become less motivated and/or frustrated which in turn becomes the reason for them to be left behind while their non-Black counterparts who are not subjected to these disparate kinds of racist treatment at the hands of JPMorgan Chase's managers excel.  Compared to our non-Black counterparts who are more likely to be promoted within every two years of service, too many Black JPMorgan Chase employees are stuck at the associate level after years and years of service to the company.  Also, a Black employee at JPMorgan Chase should

not have to relegate him or herself to "horizontal racist" status to secure or grow his or her career in the company.

31.     If it was not the blatant intentional infliction of career regression and career stagnation on the basis of race then it was the steering of Blacks to duties and stereotypes that can only be regressive and/or stagnant to a Black employee's financial career ambitions as outlined throughout this Complaint.  The sad thing is that if and/or when we complain about the disparate treatment against us to our said managers, JPMorgan Chase's Human Resource Department and/or its senior level managers and senior level executives, the complaint is either ignored, aided, abetted, enforced, shooed away and/or dismissed as was my experience.

32.     The disparate treatment of me being subjected to be treated as the house slave reminiscent of the 1800s era of slavery that I endured at the hands of Defendants, Khavin and Shillingford, treatment that again had been condoned and ratified by JPMorgan Chase, its HR department, senior level executive and senior level manager, John Donnelly and Defendant Philippe Quix respectively (see more in Third and Fifth Causes of Action – "Aiding and Abetting Title VII of the Civil Rights Act of 1964 Violations" and "Failure to Take Steps to Prevent Discrimination, Retaliation and Harassment in Violation of Title VII of the Civil Rights Act of 1964"), at times caused me to become overwhelmed with stress and anxiety which resulted in physical pain which caused me either having to take days off as sick days from work or to seek medical attention which included doing x-rays and ultrasounds.

33.     My tenure at JPMorgan Chase caused and continues to cause me suffering.  To know that I worked so hard to excel in high school and in college whereby I graduated at the top of both classes to get a job at a company where I dreamed of working with influential, respectable and smart people who I thought would have been instrumental in the guidance and development of my financial career irrespective of my race and came to find out that the company, JPMorgan Chase that purports itself on its website and in its Code of Conduct policy to be committed to diversity and inclusion,

**COMPLAINT**

condones and ratifies racial discrimination including disparate treatment, defamation of character and the intentional infliction of career regression and career stagnation by its managers on the basis of race, has caused me severe pain. I have explained in full and raw details in each of my "Causes of Action" further in this Complaint, the racial discrimination I suffered at the hands of JPMorgan Chase's managers, the aiding and abetting of it and/or the failure to take actions against or to prevent it.

34. I, Candice Lue, seek to put an end to JPMorgan Chase's, its HR Department's and its managers' ongoing culture of racial discrimination against Blacks, an end to the enforcement of horizontal racism by Fidelia Shillingford and others like her who selfishly engage in these horrific acts to further or to secure their own corporate careers and to recover damages for the losses, emotional pain and suffering I have incurred as well as damages for the harm caused as a result of the Defendants unlawful discriminatory acts as highlighted in my ten causes of action.

## PARTIES

35. I, Candice Lue, Plaintiff, at all times relevant to this Complaint and at all times mentioned herein was, an employee of Defendant JPMorgan Chase & Co., located at 270 Park Avenue, New York, NY 10017 in the County of New York.

36. Defendant JPMorgan Chase & Co. is a Delaware corporation with its principal place of business located at 270 Park Avenue, New York, NY 10017 in the County of New York. JPMorgan Chase & Co. is headed by a Board of Directors which oversees processes and programs including the company's diversity and inclusion program. On its website and in its Code of Conduct policy, JPMorgan Chase purports itself to be a company committed to diversity and inclusion.

37. Defendant Khavin is, and at all times mentioned herein was, an employee of Defendant JPMorgan Chase & Co., located at 270 Park Avenue, New York, NY 10017 in the County of New York.

**COMPLAINT**

38.     Defendant Shillingford is, and at all times mentioned herein was, an employee of Defendant JPMorgan Chase & Co., located at 270 Park Avenue, New York, NY 10017 in the County of New York.

39.     Defendant Dubowy is, and at all times mentioned herein was, an employee of Defendant JPMorgan Chase & Co., located at 277 Park Avenue, New York, NY 10172 in the County of New York.

40.     Defendant Vega at all times mentioned herein was, an employee of Defendant JPMorgan Chase & Co., located at 28 Liberty Street, New York, NY 10005 in the County of New York.

41.     Defendant Quix is, and at all times mentioned herein was, an employee of Defendant JPMorgan Chase & Co., located at 270 Park Avenue, New York, NY 10017 in the County of New York.

42.     Defendant Poz is, and at all times mentioned herein was, an employee of Defendant JPMorgan Chase & Co., located at 270 Park Avenue, New York, NY 10017 in the County of New York.

43.     Defendant Sullivan is, and at all times mentioned herein was, an employee of Defendant JPMorgan Chase & Co., located at 383 Madison Avenue, New York, NY 10179 in the County of New York.

44.     Defendant Liasis is, and at all times mentioned herein was, an employee of Defendant JPMorgan Chase & Co., located at 383 Madison Avenue, New York, NY 10179 in the County of New York.

45.     I am informed and believe, and on that basis allege, that Defendants Does 1 through 10, inclusive, are individually and/or jointly liable to me for the wrongs alleged herein. The true names and capacities of Does 1 through 10, inclusive, are unknown to me at this time. I sue Defendants Does 1 through 10, inclusive, by fictitious names and will amend this Complaint to allege their true names and capacities after they are determined.

**COMPLAINT**

46.    I allege that each of the Defendants is, and at all times relevant to this Complaint was, the employee, employer and/or co-conspirator of the other Defendants and, in doing the acts alleged herein, was acting within the course and scope of such positions at the direction of, and/or with the permission, knowledge, consent and/or approval of, the other Defendants.  As such, each Defendant, through its acts and omissions, is responsible for the wrongdoing alleged herein and for the damages suffered by me.

## JURISDICTION AND VENUE

47.    Pursuant to Article 5, Section 509 of the New York Code of Civil Practice Law and Rules, subject matter jurisdiction is proper in the United States District Court, Southern District of New York, County of New York, State of New York.

48.    Pursuant to Article 5, Section 509 of the New York Code of Civil Practice Law and Rules, venue is proper in this county because, notwithstanding any provision of this article, the place of trial of an action shall be in the county designated by the plaintiff, unless the place of trial is changed to another county by order upon motion, or by consent as provided in subdivision (b) of rule 511.  Venue is further proper in this county because this is where the Defendants are located, do business, worked and were paid and/or where the unlawful acts giving rise to this action occurred.

## FACTUAL ALLEGATIONS

### A.  I Had Been An Employee At JPMorgan Chase & Co. for 3 Years & 4 Months

49.    I was hired by JPMorgan Chase on August 20, 2012 as an Energy Confirmations Drafting Analyst in Investment Banking Global Commodities Confirmations Department reporting to Defendant Sullivan.  This position was officially terminated on November 7, 2014 due to the sale of JPMorgan Chase's physical commodities business.

<strong>COMPLAINT</strong>

50. I was rehired by JPMorgan Chase on November 10, 2014 as a Credit Reporting Risk Analyst in Asset Management Credit Risk Department reporting to Defendant Shillingford. However, due to the closeness in the termination and rehire dates and the easier process to transition versus coming in as a new hire, my rehire was treated as a transfer.

51. On January 6, 2016, I was terminated by JPMorgan Chase with immediate effect with the reasons being 1) For repeatedly refusing to do tasks assigned to me (the discriminatory tasks of printing, collating, stapling and lugging to the group's monthly meeting, the presentation materials of each of the non-Black team members and the putting of meeting presentation attachments together in one email to make work *"easier"* for the said non-Black team members), 2) Based on the retaliatory and pretextual "performance improvement plan" (EXHIBIT C) which I painstakingly refuted in Second Cause of Action – "Unlawful Retaliation on the Basis of Race in Violation of Title VII of the Civil Rights Act of 1964", 3) Based on my peaceful act of defiance of the Written Warning (EXHIBIT F) that was presented to me on September 24, 2015 with the **expectation**: *"It is my expectation that Candice perform the job responsibilities for which she was hired; she is expected to print all materials for our monthly team meeting and provide copies for each member"*, 4) Because JPMorgan Chase's management deemed the emails that I composed to expose their unlawful act of disparate treatment against Blacks to be *"unprofessional"* and 5) For being *"disrespectful"* to my horizontal racist manager, Shillingford.

52. With regards to the second reason listed for my termination, besides the fact that I am usually a very detailed person, I did a lot of what they call "CYAing" in corporate because of the nature of the environment in which I worked. With that said, I sent a lot of emails in representation of my work which will reflect the quality of work I produced or was able to produce working for JPMorgan Chase. All these emails should still be stored away on some server at JPMorgan Chase. So, I implore and to some extent challenge JPMorgan Chase to release all of those said emails in defense of their charge of "performance issues" against me that led to my firing on January 6, 2016.

**COMPLAINT**

JPMorgan Chase could also use this opportunity as "proof" of the email "unprofessionalism" they have accused me of. How ironic, later you will read about how Defendant Liasis told me that *"you are very professional. You need to tone down your professionalism to integrate with the team."* As for the fifth reason for my firing, I would also implore JPMorgan Chase to provide examples of such *"disrespect"* to my horizontal racist manager, Shillingford, as I think that they have misconstrued taking a stance against racial discrimination for disrespect.

53.    Also, please bear in mind that the first and third reasons for which I was fired are the said reasons of racial discrimination that I complained about in: the email I sent to Shillingford on April 24, 2015 (EXHIBIT B), the meeting I had with Khavin on April 24, 2015, the email I sent to the team on May 27, 2015 (EXHIBIT B), the racial discrimination charge I made against Khavin to HR on May 29, 2015, the email I sent on August 3, 2015 (EXHIBIT C) on which I copied JPMorgan Chase's senior level executive, John Donnelly, Global Head of HR who reported to Jamie Dimon, the charge I filed with the EEOC on August 13, 2015 against JPMorgan Chase whereby I made it clear and it was **obvious** that as the only Black analyst in the group I was being treated *"as if I am the help and as if this is 1910"*. Also, why would I have been continuously complaining if I knew that these demeaning and discriminatory tasks were *"the job responsibilities for which* [I] *was hired"*? I was never told that as the only Black analyst on the team, I would have to serve the non-Black team members, as became obvious, or to make their work *easier* for them before I was hired because these tasks **never** existed for my position before I took the job. And, if they had existed and whether or not were done by another Black employee, I would **not** have taken the said job.

## B. **JPMorgan Chase Surreptitiously Tried To Contort My Stance Against Racial Discrimination Into Insubordination**

54.    After the EEOC served notice of my charge upon JPMorgan Chase, there was a surreptitious move by the company to cover up their unlawful act of disparate treatment against me. This surreptitious move was to contort my stance against the disparate treatment against Blacks that was

meted out to me into insubordination. As Shillingford stated in the "written warning" discussed above (EXHIBIT F), *"On September 23, 2015, there was another incident. Candice was asked to print only the documents for which she is responsible and that of her manager for the monthly team meeting on September 24th and she again refused".* My "act of refusal" was to say via email that, *"Please be advised that I will be sending out and printing the [report for my presentation] for tomorrow's meeting."* In response to my email, Shillingford accused me of being *"disrespectful and insubordinate".* Shillingford's September 23, 2015 **ploy** to *"print only the documents for which she is responsible and that of her manager"* was not only an attempt to cover for Khavin's disparate treatment against me by treating me as the house slave but it was a surreptitious way to invoke insubordination by again, using the horizontal racist, Shillingford, as cover for the unlawful acts. Shillingford's own statement on the said written warning proves that this was a ploy, *"Note: Candice did not print the materials of other team members including my materials; she only printed her materials."* Why was she complaining that I did not print *"the materials of other team members"* if the directive was *"to print only the documents for which she is responsible and that of her manager"*? Furthermore, there was a White administrative assistant on the team during the fourteen months that I was in the group; did Shillingford ever ask the said White administrative assistant to print anyone's materials for any of the team meetings? Of course she didn't.

55.     To invoke insubordination by saying that she instructed me to *"print only the documents for which she is responsible and that of her manager for the monthly team meeting on September 24th and she again refused",* Shillingford was being disingenuous and willful because prior (November 2014 to April 2015) to her accepting and agreeing to the roles of enabler, facilitator, coordinator and enforcer of the second class treatment from Khavin that was meted out to me, in preparation for the monthly team meetings, Shillingford and I shared the responsibility of printing, collating, stapling, etc. our respective presentation materials working as a team in this regard to ensure that our presentation materials were prepared for presentation at the meeting. We would both print, etc.

each other's presentation materials and if she needed help with printing, etc. her presentation materials, in addition to mine, I would prepare hers. Sometimes if Shillingford was busy with an urgent task and her presentation materials needed to be printed, she would say to me, *"you want me to print it"* then I would collect the copies from the printer, collate, staple and combine her presentation materials with my copies for sending out to the team and taking into the meeting. Also, prior to Shillingford enforcing the second class treatment from Khavin and taking it a step further by willfully turning me into her personal slave with the condescending and demeaning "print my stuff, this is your job" attitude, because we were working as a team, to ensure that all of our presentation materials were prepared and distributed to team members, I would personally go over to Shillingford's desk to check in with her to confirm if her documents were finalized and offered help in any way to print, etc. her presentation materials and combine them with mine for distributing to the team via email and in the monthly meeting. Even if it took staying late into the evening before the early morning monthly meeting the following day, I would stay late to prepare our presentation materials and distribute to team members. We would print, collate, staple, etc. the copies of each other's presentation materials for the meeting without care of which one of us is doing any part of this task. As long as all of our presentation materials were prepared for the meeting, that's all that mattered and we worked as a team to get this job done. Even when Shillingford and I were both finalizing our presentation materials for printing, etc., she for instance has said verbally and/or in writing, *"Can I ask you to print [name of document]?"* when she needed help with her printing, etc. or if we were establishing who is printing, etc. which documents for the meeting. Even in the monthly meeting when Khavin in a demeaning manner directed any inquiries to me about sending out and/or printing presentation materials for the whole team (aka being treated like the house slave for the team) that have nothing to do with my or Shillingford's presentation materials (EXHIBIT A – EEOC Intake Questionnaire – Question # 6 – Page 2, paragraph 2), I would say, *"I sent out [or I took care of] Shillingford's and my presentation materials."* These are

**COMPLAINT**

just some examples to show that although Khavin was still insisting that I be the house slave for the team, I was still helping to print, etc. Shillingford's presentation materials in addition to mine for the team meeting because we worked as a team in that regard prior to Shillingford accepting the horizontal racist role of enforcing Khavin's disparate treatment against Blacks, against me.

56.     The foregoing in and of itself proves that Shillingford and JPMorgan Chase were being surreptitious, disingenuous and willful to invoke insubordination because I took a stance against the discriminatory act of disparate treatment against me on the basis of my race. This insubordination **ploy** was Shillingford and JPMorgan Chase's surreptitious way of trying to cover up Khavin's unlawful behavior of treating me like a house slave reminiscent of the 1800s plantation style living, in the era of slavery when Blacks had to serve their masters and their masters' families after the company was served notice by the EEOC that a charge was filed against it.

57.     I would also like to note that because of the amount of work preparing my up to three presentations for the monthly team meeting entailed, which included conducting necessary research to be able to speak to the points in my presentations and to be prepared to answer grueling questions from the team, especially from Khavin, just only helping to print, etc. Shillingford's presentation materials, I would have to work late. So, one could only imagine how late I would have to work to print, collate, etc. the said materials for everyone on the team. However, according to what Khavin told me in her unapologetic, unrepentant and condescending speech in our April 24, 2015 meeting, *"I don't care if you have to be here working at 10 or 11 o' clock, it is your job and I expect you to do it."* – Bearing in mind that everyone else, the Whites and Asians, including the ones on my job level, would have been gone home by 6:00 pm. This behavior by Khavin was condoned and ratified by JPMorgan Chase as, according to Defendant John Vega who "investigated" my charge of racial discrimination against Khavin and to whom I explained my working situation and told the aforesaid words from Khavin verbatim, his investigation *"had found nothing discriminatory."*

**COMPLAINT**

## C. Job Description – CREDIT REPORTING RISK ANALYST

58.    In the role as a Credit Reporting Risk Analyst (the position for which I was hired), per my job description (EXHIBIT H – dated 10/29/2014), the responsibilities require: A strong risk and control mindset, be very detailed oriented, have excellent analytical and written/verbal communication skills as well as be able to work under pressure and able to deliver on multiple tight, time sensitive timelines.  Specific responsibilities will include:

i)    Performing on-going monitoring and periodic reviews of the creditworthiness of approved counterparties

ii)    Working with large volumes of data to conduct adhoc analyses on counterparties and exposures as needed

iii)    Updating and distributing daily Counterparty reports

iv)    Contributing to team-wide efforts such as risk assessment methodology enhancements, portfolio-wide reviews and preparing management presentations.

QUALIFICATION AND SKILLS REQUIREMENT:

i)    Undergraduate degree with 1+ years of relevant work experience – strong academic performance with coursework in Economics, Statistics and Finance; knowledge of exchange-traded products and derivatives preferred

ii)    Demonstrated fundamental credit analysis skills

iii)    Exceptional analytical skills (naturally inquisitive/intellectually curious)

iv)    Superior attention to detail

v)    Demonstrated interest in/knowledge of global financial markets and current regulatory/legislative agendas

vi)    Self-starter with strong project management skills – be able to independently manage multiple tasks and priorities under tight deadlines

vii)    Excellent team player

**COMPLAINT**

viii)     Strong PowerPoint/Excel/MS Office skills

## Job Description - COUNTERPARTY CREDIT RISK ANALYST

59.     In the role as a Counterparty Credit Risk Analyst (the position of the other analysts on the team), per the job description (EXHIBIT H - dated 10/29/2014), the responsibilities require: A strong risk and control mindset, be very detailed oriented, have excellent analytical and written/verbal communication skills as well as be able to work under pressure and able to deliver on multiple tight, time sensitive timelines. Specific responsibilities will include:

i)     Performing on-going monitoring and periodic reviews of exposures

ii)     Working with large volumes of data to conduct adhoc analyses as needed

iii)     Updating and distributing daily Counterparty reports

iv)     Contributing to team-wide efforts such as risk assessment methodology enhancements, portfolio-wide reviews and preparing management presentations.

QUALIFICATION AND SKILLS REQUIREMENT:

i)     Undergraduate degree with 1+ years of relevant work experience – strong academic performance with coursework in Economics, Statistics and Finance; knowledge of exchange-traded products and derivatives preferred

ii)     Exceptional analytical skills (naturally inquisitive/intellectually curious)

iii)     Superior attention to detail

iv)     Demonstrated interest in/knowledge of global financial markets and current regulatory/legislative agendas

v)     Self-starter with strong project management skills – be able to independently manage multiple tasks and priorities under tight deadlines

vi)     Excellent team player

vii)     Strong PowerPoint/Excel/MS Office skills

**COMPLAINT**

60.    As can be seen per the foregoing job descriptions, the requirements for the Credit Reporting Risk Analyst (that I was), were almost identical to the requirements for the Counterparty Credit Risk Analysts.  Meaning, that as a Credit Reporting Risk Analyst, I had to be **no** less qualified than the Counterparty Credit Risk Analysts on Khavin's team thus should not have been treated at a lower standard than them.  The job descriptions also show that there was no reason other than Khavin's racial discrimination against Blacks why I alone, the only Black analyst on the team, was assigned the demeaning and discriminatory tasks of printing, collating, stapling and lugging of the non-Blacks' presentation materials (times 13) to the monthly team meeting as well as being ordered to search through my emails for the said presentation materials sent by the team, open each email sent, pull the attachments and put all those attachments together in one email to make it *"easier"* for the non-Black team members while making it three times harder for me.  In addition, the taking of the meeting minutes should not have been only assigned to me after two years of prior rotation.

61.    I graduated Summa Cum Laude with a degree in Finance and Economics (as required per the job description, Statistics was a part of my coursework).  At the time of my hire, I had a little over six years work experience working in the financial industry with a total of approximately 4 years working at JPMorgan Chase (2 years and 3 months as an employee and an accumulation of 1½ years as a temporary consultant).  The other 2 years I worked accumulatively at two other major financial institutions as a temporary consultant.

D. **JPMorgan Chase, Its Managers and Its HR Department's Retaliation against Me and Their Scheme to Cover Up Khavin's Discrimination Against Blacks**

62.    Defendant Helen Dubowy is an Executive Director/HR Business Partner/Ploy and I will explain "Ploy".  My July 30, 2015 mid-year performance review in which I was presented with the unlawful, retaliatory and pretextual "performance improvement plan" in Helen Dubowy's presence was initially slated for Thursday, June 18, 2015 from 4:00 – 4:30 pm with Shillingford and Khavin.  Shillingford's own performance review to be done by Khavin was scheduled for Wednesday, June

**COMPLAINT**

17, 2015. In a May 26, 2015 email from Khavin, she had requested that I provide feedback on Shillingford's performance which I provided on June 1, 2015 saying, "*I consider Fidelia to be a hands-on manager who is willing to roll up her sleeves and help. She is hardworking, does a good job in explaining concepts to me where necessary and gives good recommendations for work-related training* (this happened in the early tenure of my job so I had to be fair). *However, I have a lack of trust and confidence in Fidelia as I consider her to be the enabler, the facilitator and the coordinator of the second class treatment that has been meted out to me*" (this was what it became starting around April 2015). Khavin sent me an email on June 17, 2015 requesting specific information on what I meant by "*However, I have a lack of trust and confidence in Fidelia as I consider her to be the enabler, the facilitator and the coordinator of the second class treatment that has been meted out to me.*" I responded to Khavin's request by attaching 1) the email that I had sent to her and Shillingford highlighting the unfairness of my access to the company's "Work from Home" benefit compared to the other analysts on the team, 2) the email that I sent to the team on May 27, 2015 expressing the unbearable unfairness and humiliation of Khavin "*treating me as if I am the help. As if this is 1910*"and Khavin's unapologetic and unrepentant response and 3) an email invite that I had sent to Shillingford to discuss the lack of confidence I had in her as a manager as I was then starting to suspect that not only was she in cahoots with Khavin for treating me as the help but because of the disturbing evidence I saw whereby Shillingford was having correspondence about me with my former manager, Defendant Sullivan (EXHIBIT Q). From my response to her request, sensing that she **is** the main perpetrator "*of the second class treatment that has been meted out to me*" as I stated in my feedback on Shillingford, Khavin refrained from further corresponding on that matter. However, between 9:00 and 9:30 am on the morning of Thursday, June 18, 2015, the next day, I received an updated calendar invite email from her, Khavin, changing the aforesaid scheduled meeting for my 2015 mid year performance review from the said Thursday, June 18, 2015 from 4:00 – 4:30 pm to the next day, Friday, June 19, 2015. The thing is, I would not have

<strong>COMPLAINT</strong>

been in the office on Friday, June 19, 2015 because for two months prior, it was on the team's Outlook shared group calendar (to which all team members have access and which we all, including Khavin, check to see who will be out, the dates and the reasons) that I would have been on vacation from Friday, June 19, 2015 to Friday, June 26, 2015. In any event, I responded to Khavin's email telling her that I would be out on vacation and *"out of commission"* on Friday, June 19, 2015 as I was going to be out of town for my vacation.

63.     Since starting Monday, June 22, 2015, Khavin herself would have been out of the office and on "medical" leave for three months, I would have thought that since when I return from vacation she would not have been around to sit with Shillingford to do my mid-year review (as this is the procedure) that she would just let me keep my scheduled time of Thursday, June 18, 2015 from 4:00 – 4:30 pm and/or reschedule someone else for Friday, June 19, 2015. As, from the best of my recollection, I and maybe only one other person who had possibly already had his mid-year review done would have been out on Friday, June 19, 2015. However, because of Khavin's mastery in covering up her bigotry against Blacks, she failed to do either of the obvious. Also, with the performance review scheduled for just 30 minutes and Khavin being informed about my vacation from 9:30 in the morning of Thursday, June 18, 2015, there could have more than been some flexibility to ensure that my review was done. Instead, Khavin cancelled the meeting invite for Friday, June 19, 2015 and responded to me saying that my performance review will be rescheduled when I return to the office from vacation.

64.     Khavin knew that as the main perpetrator of the second class treatment against me which I was not afraid to identify her to be, it was in her best interest to stay clear and by all means to remove herself from my 2015 mid year performance review meeting. Secretly acknowledging the possibility of unlawful behavior on Khavin's part as it relates to *"the second class treatment that has been meted out to me"*, Khavin, Shillingford and most likely others, namely HR representatives not only had to recognize the importance of Khavin not taking part in my 2015 mid year

performance review but they had to put in place, a cover-up plan which included fabricating things about my character and fabricating things to make me seem incompetent by way of a retaliatory and pretextual "performance improvement plan".

65.     After more than a month later, on short notice, at 11:30 am on July 30, 2015, Shillingford informed me that she will be doing my mid-year performance review at 12:00 pm (in half an hour). I went to the conference room as she requested and sitting in there was Defendant Helen Dubowy. I had no prior knowledge that this woman from HR who I was meeting for the first time would be present at my performance review. After we were settled for the meeting, Helen Dubowy (the ploy) addressed me saying, *"Alex* (Khavin) *couldn't be here. I'm here to make sure things go smoothly."* This woman whom I had never met before or with whom I had never even done an email correspondence was supporting everything that was purported on the retaliatory and pretextual "performance improvement plan" (EXHIBIT C) that Shillingford presented me with as if I had previously worked with her in some capacity or another or as if, barring what she was told by the perpetrators, Khavin and Shillingford, she was personally aware of the quality of work I had or was able to produce.   In covering up, aiding and abetting Khavin's bigotry, Dubowy was also emphasizing that the tasks that Khavin disparately assigned to me, the only Black analyst on the team, the said demeaning and discriminatory tasks that I complained about to HR in my racial discrimination claim against Khavin, were my job to do.

66.     It was as clear as day that after raising the issue of Khavin's racial discrimination against me to Khavin herself on April 24, 2015, doing the same to HR on May 29, 2015 and on June 17, 2015 responding to Khavin's request about the feedback I gave for Shillingford in the way that I did that JPMorgan Chase, its managers and its HR department's unlawful retaliation against me would have been too obvious if Khavin was the one presenting me with the retaliatory and pretextual "performance improvement plan" at my mid year performance review. So, to cover up Khavin's unlawful discriminatory act of treating me as a house slave on the basis of my race, JPMorgan

Chase, its managers and its HR department's plan was for Khavin to be removed from my performance review meeting and to let Dubowy attend as a way to keep their surreptitiousness under wraps. With that said and in light of the foregoing, Defendant Helen Dubowy's attendance at my July 30, 2015 mid-year performance review as well as the "performance improvement plan" with which I was presented was a pre-planned, pre-arranged and well thought out ploy (more than a month of planning) to unlawfully retaliate against me and to unlawfully cover up Khavin's act of racial discrimination against Blacks by making sure that Khavin, the initial, and at the time, formally accused perpetrator of the bigotry against me was not present at my 2015 mid-year performance review.

### E. **Alex Khavin's and Fidelia Shillingford's Disparate Treatment on the Basis of My Race**

67.    As outlined in "C", the job descriptions for all the analysts on the team were vastly the same. However, as if I was the house slave, Khavin additionally assigned me, and solely me, the degrading, demeaning and discriminatory task of printing, collating, stapling and lugging to the group's monthly meetings, the presentation materials of each of the non-Black team members. She ordered me to search through my emails for presentation materials sent by the team, open each email sent, pull the attachments and put all those attachments together in one email to make it "*easier*" for the non-Black team members while making it three times harder for me, the only Black analyst on the team. Khavin also made the change to make the taking of the monthly meeting minutes no longer rotational, but to be solely my job. Of these three additional assignments, the first two were **non-existent** prior to me joining the team and the third was rotational among all the analysts and associates during the two years prior to me joining the team. As it related to benefiting the department and the company as a whole, the first two assignments were unessential as they were only a benefit/perk for the non-Black members of the team at the expense of me, the only Black analyst on the team. A benefit/perk, that like a plantation slave, I would have never gotten the opportunity to enjoy. Khavin was cognizant of not making any of the non-Black analysts and/or

associates feel demeaned by solely assigning any one of them the aforementioned tasks but for me, the only Black analyst on the team, the treatment was different – *"It's your job"*.

68.    Khavin used Defendant Shillingford as cover to extend her bigotry against Blacks to me. Shillingford, who again is Black, under the directive of Khavin, engaged in horizontal racism whereby Shillingford harassed me verbally and/or in writing each month by enforcing Khavin's disparate treatment against Blacks by treating me as a house slave. Shillingford vehemently and consistently told me that the printing, collating, stapling, etc. of the presentation materials of each of the non-Black team members and the lugging of same to the group's monthly meeting along with the task of taking the monthly meeting minutes were solely my job even though she had been on the team from its inception and was aware that none of the non-Black analysts or associates was ever solely or on a rotational basis assigned the tasks of printing, etc. everyone on the team's presentation materials for the monthly meeting or solely assigned the task to take the minutes of the said meeting. Shillingford also expressed the same attitude as Khavin when I complained about the disparate treatment against me on the basis of my race by telling me that, *"no one is holding you here."* And, *"If you don't want to do the work, employment is at will. The door is right there."* Because of the team's makeup of majority Whites and Asians, Shillingford was the only means through which Khavin could discreetly extend her racial discrimination against Blacks to me and that is why Khavin made Shillingford my manager (see more on this in "Ninth Cause of Action - Unwillingness/Failure to Promote to a Managerial Position on the Basis of Race"). None of the non-Black employees in the group was treated like this and none of them reported to Shillingford. Khavin's bigotry would have been too obvious if she was to make me report to the White manager who all the other analysts and associates including my predecessors reported to. So, she figured out that the best way to obscure her bigotry against Blacks was to use Shillingford who was willing to engage in horizontal racism to enhance her own job security.

**COMPLAINT**

69.     While I was severely punished for taking a stance against obvious disparate treatment against me in the assignments that were off limits for the non-Black analysts on the team but were solely assigned to me to do, in a conversation I overheard among three of my co-workers on the afternoon of September 16, 2015 whereby they were talking about a report, the Reconciliation Report, that I had to do, this co-worker who had been with the team for more than two years was telling the other two newer co-workers the following: "*I did the reconciliation report for a month. After that I said, I'm not doing this. You know, the reconciliation report that Candice works on. It's hard and complicated. After a month (laughs) I said, I'm not doing this anymore.*" This statement from the "horse's mouth" demonstrates disparate treatment against me in its purest form. Because, here we have a White employee (an analyst at the time) on the team right-out refusing to do an **essential** task and unlike me, he was not severely punished by means of a poor performance review, he was not given a written warning, both of which would have barred him from all of the company's progressive benefits and most of all, he was not terminated. As a matter of fact, he got **promoted** – Bearing in mind that for this White employee to have gotten a promotion, his performance rating would have to be, per JPMorgan Chase's "promotion criteria", at least 2 years of Meets Expectation (M) or above performance, with rating of Meets Expectation Plus (M+) or Exceeds Expectation (E) in the year of the promotion. (See "Factual Allegation F - The Section Led by Shillingford Who Is Black Is Deprived of Adequate Human Resources" as this is the said employee I talked about who reported in the weekly meeting where we all reported on what we have on "our plate" to do that all that he had on his plate to do was to update his performance information for his year end review.) Because he was obviously free to pick and choose whatever he wanted to do and what he didn't want to do got sent to the "Black" side (because of his refusal to do the above-mentioned report and before me joining the team, Shillingford, who is a vice president had to take on the task of doing the said report), he basically had nothing to do. However, contrary to the treatment of my White counterpart, in my situation, a Black employee taking a stance against

**COMPLAINT**

disparate and discriminatory treatment against me for being racially assigned **unessential** tasks which did not benefit the department or the company as a whole but only benefitted the non-Black employees on the team which in accordance with Title VII of the Civil Rights Act of 1964 is against the law, I was severely punished by way of a poor performance review and put on a retaliatory and pretextual "performance improvement plan", I was given a written warning, both of which barred me from accessing the company's progressive benefits and I was ultimately terminated on January 6, 2016. Also, please bear in mind that there was also a second incident by this said White employee where the **essential** task he refused to do was passed on to me to do with no severe punishment for him due to his condition of "Caucasianitis".

70.     Why when Khavin directed Shillingford to tell me that unlike the other analysts who could just send an email to the team saying, "I am not feeling too well today so I will be working from home", I had to send Shillingford an email letting her know my situation and asking her, Shillingford, for permission to work from home (permission which would have to come from Khavin herself) and she, Shillingford, would communicate accordingly to the team (EXHIBIT L); why didn't Shillingford tell Khavin that it was unfair to treat me at a double-standard? Why? Because Shillingford is a horizontal racist who accepted and agreed to the task of being the enabler, the facilitator, the coordinator and the enforcer of Khavin's disparate treatment against Blacks against me - Bearing in mind that generally employees below the analyst level do not have access to the "Work from Home" benefit and Khavin's disparate treatment against me was as if I was below the other analysts on the team (see in # 25 where I wrote about how Khavin accidentally blurted out to me in our April 24, 2015 meeting, "*you are not an analyst!*").

71.     Based on my upbringing, I am not the kind of person to go and find racism "under a rock" (abundance of evidence available) but this directive from Khavin is reminiscent of the devious ways in which Black voters were treated to frustrate them and to prevent them from using their voting privilege before the 1965 Voting Rights Act was passed. Prior to the 1965 Voting Rights Act, in

order to vote, it had been known that many Black voters were forced to recite the entire Constitution or explain the most complex provisions of state laws, a task which was not asked of White voters to do. So here we have it, in order for me to get access to my "work from home" privilege, Khavin's directive forced me to first send Shillingford an email "explaining" my situation and asking her, Shillingford, for permission to work from home (permission which would have to come from Khavin herself) and she, Shillingford, would communicate accordingly to the team, a directive that none of the non-Black analysts and/or associates ever had to do or to follow. Again, all the non-Black analysts and/or associates had to do prior to me joining the team and up to the time of this unfair directive that was meted out to me, was to send an email to the team saying, "I am not feeling too well today so I will be working from home". As I said in my Exhibit L email dated May 7, 2015 *"two other analysts did [this], this said week"*.

## F. **The Section Led by Shillingford Who Is Black Was Deprived of Adequate Human Resources**

72.     When the Credit Risk Analysis section which was led by a White or a Non-Black manager had enough human resources whereby no one in that section was overwhelmed with work, at times seemed to have very little to do (in a weekly meeting, we all reported on what we had on "our plate"), could leave work between the hours of 5 and 6 pm on any given day, got additional human resources even with their already comfortable workload (compared to mine and my manager's, Defendant Shillingford), the Credit Risk Reporting section which comprised of myself and Shillingford (both Black) was time and again denied any additional human resource even though on many occasions unrealistic expectations were required of us from the said senior managers denying us the additional human resource. In August 2015, two new, non-Black headcounts were added to the group and those two new people went straight to the Credit Risk Analysis section which again was led by a White or a Non-Black manager, irrespective of the fact that the Credit Risk Reporting section which was led by a Black manager, Shillingford, was desperately in need of additional help.

It was as if by being Black, Shillingford and I had to work twice as hard as the non-Blacks in the group or as if, Shillingford being Black had to make do with the limited resource with which she was provided. In meetings after meetings with Shillingford as well as in writing, I had stressed the need for an additional human resource to help with our workload. As is exposed in my August 3, 2015 email response - EXHIBIT C – paragraphs 3 and 4, the lack of human resource in Shillingford's section was an issue even before I joined the group but Shillingford did whatever it took to appease her White "masters". Case in point, there was a tedious report, the Reconciliation Report, that Shillingford had to do herself prior to me joining the team as the said tedious report would have been "unrealistically" too much work for any of my non-Black predecessors to do but for me the Black analyst, Shillingford quickly unloaded it on me after I joined the team. Instead of stressing the need for an additional human resource, Shillingford did whatever it took to appease Khavin and Quix and to get the report done. That is why when everyone could leave work between the hours of 5 and 6 pm on any given day, I had to be at work on average two hours later.

73.     Because of my persistence in requesting that Shillingford speak with Khavin about getting a well needed human resource, upon the directive of Khavin, I was ordered to outline in full details the methodology and time it took me to do each of my tasks. None of the non-Black analysts and/or associates in the Credit Risk Analysis section had to do this prior to the section getting two additional headcounts in August 2015. I was actually in the bi-weekly "Analysts and Associates" meeting when the announcement of the two new headcounts was made and there was no sense of relief as it would have been in the case of the Credit Risk Reporting section but merely an "okay" or, "less work for me to do" attitude. In any event, after spending valuable time outlining in full details the methodology and time it took me to do each of my tasks, the request for an additional human resource was denied and the Credit Risk Reporting section was left with a designated disgruntled "*half a person*" who was an employee in the Credit Risk Analysis section. This "*half a person*" was asked to partially help out with one of the most tedious reports that I had to do proving that the

COMPLAINT

Credit Risk Reporting section was more in need of additional human resource than the Credit Risk Analysis section. Besides the fact that this *"half a person's"* help was limited and inadequate to meet the unrealistic demands of the job, after a time, his disgruntlement got to me that I took back full control of the said tedious report.

74. In furtherance of explaining how light the workload was at times in the non-Black Credit Risk Analysis section, in one of the weekly meetings where we all reported on what we had on "our plate", the only thing an analyst had to do was to update his performance information in preparation for his end of year performance review. For me, due to my workload, updating my performance information in preparation for my end of year performance review was something I would have had to do on my own time, before or after work, or stay at work later to complete. I also accidentally noticed another analyst from the said Credit Risk Analysis section, on the job, checking out my LinkedIn profile and his explanation for that was he was just checking everyone on the team's LinkedIn profile. Being in the Credit Risk Reporting section, I did not have that "on the job" luxury.

75. Credit Risk Reporting was expanded in May 2015 with a White manager heading up that section of the expansion and he had not only been approved to hire one analyst who started at the beginning of September 2015 but soon after, he was approved to get an additional headcount to share their workload. The same workload Shillingford has had two years prior to me joining the team and during my tenure. Yet, she was constantly passed over for and/or denied a second headcount. As evidence that Shillingford's and my workload was the same as the expanded section of Credit Risk Reporting, I was always at work working late hours along with the two members of the said expanded section as they awaited their additional team member. The new manager heading up that said expanded section would term the three of us always working late as us, *"burning the midnight oil"*. A managing director who regularly passed us on her way out in the evenings would make the comment that *"it is the same three people every night [working late]"*. While Shillingford might not have been there most evenings working late with us, in one of our earlier one on ones

**COMPLAINT**

where the topic of workload and resources came up, she tried to rationalize that it was not only me who had the overwhelming workload as according to her, when she goes home in the evenings (and I do not know if she did this every evening or how often she did this), she had to sign on from home to help with getting her work done. And, *"when I work on weekends [from home], you know what my husband tells me? To get a life."* Why is it that a White manager who joined the group long after Shillingford and whose section had the same workload as Shillingford's was able to get adequate human resources for his section while Shillingford, a Black manager was deprived of the same resource?

### G. Khavin Rendered Second Class Treatment to Shillingford and Shillingford Accepted It

76.     As I stated in #21 of the "Statements of Claim", from the first day I joined the team, I did not only notice Shillingford's "yes, yes, master-subordinate" behavior when communicating with Khavin but I was perturbed by it. Shocked, I was questioning myself, "why is she behaving like that?" So, accepting a relationship like that with Khavin, Shillingford apparently thought that I would have accepted the same with her as my manager. In a one on one I had with Shillingford on December 17, 2014, a little over a month of me joining the team, I had an open discussion with her whereby I told her about her condescending style of management. Referring to myself as a "millennial", I let her know that unlike years and years ago when workers used to accept condescending treatment from their bosses without saying anything, millennials don't just accept that, *"we speak up"*. Her response to me was, *"I don't have time to re-word. Sometimes when Alex (Khavin) comes to my desk she talks to me condescendingly."*

77.     When from her office Khavin called Shillingford like how Cinderella's step-mother called Cinderella, Shillingford got up and ran to her. *"Yes, Yes. Yes Alex. You got it Alex."* I have never heard Khavin call any other employee in that manner.

78.     It was not unusual that work that was deemed undesirable by the non-Black analysts and associates got stuck with Shillingford to do even though as a vice president, she was at a higher

level than them. In one instance, due to the May 2015 expansion of the team that I wrote about earlier, an additional analyst was needed. In the meantime, however, backups were named to do the duties of that analyst until his hire. I could understand that as an analyst, I was named as a backup for the to-be-hired analyst and to be frank, as the only Black analyst, I was always named as the backup. But, to also name Shillingford who was a vice president as a backup for an analyst when team members on the analyst and associate levels were not named shows the type of second class treatment that was meted out to Shillingford by Khavin which Shillingford accepted. Another instance was the tedious but essential report, the Reconciliation Report that I wrote about earlier that the White analyst refused to do. Before I joined the team, Shillingford, a vice president had to end up doing it.

79.    In June 2015 when I was on vacation, the printing, collating, stapling, sending out and lugging to the monthly meeting of everyone on the team's presentation materials were done by Shillingford, a vice president who was the only other Black member of the team. None of the non-Black analysts and/or associates who were all below Shillingford's job level was demeaned by being asked/told to do these tasks. The foregoing not only demonstrates how Khavin rendered second class treatment to Shillingford but it shows how Shillingford continuously enabled and accepted it.

H.  **JPMorgan Chase Attempted To Use Salary As A Cover-up for Racial Discrimination**

80.    At face value, it would seem that I was at a higher salary range working as a Credit Reporting Risk Analyst in the Asset Management Credit Risk Department (Khavin's team) than I was working as an Energy Confirmations Drafting Analyst in the Investment Banking Global Commodities Confirmations Department (my prior job). This was the first thing that Defendant Vega, the HR representative to whom my claim of discrimination was escalated, tried to use as a defense against my racial discrimination claim at our first meeting. But, the fact is, I was actually earning about $7,000 per year less in my position as a Credit Reporting Risk Analyst than I earned

in my position as an Energy Confirmations Drafting Analyst. In my Energy Confirmations Drafting Analyst position, as a non-exempt employee, I was paid overtime for hours I worked over 40 hours per week. In my Credit Reporting Risk Analyst position, as an exempt employee, I was **not** paid for hours I worked over 40 hours per week even though I had to work long hours due to deadlines, etc. Overall, my hours of working in both positions amounted to pretty much the same but my earnings for my Credit Reporting Risk Analyst position were less. However, HR and Vega, an attorney by profession, wanted to cover up JPMorgan Chase's culture of racial discrimination against Blacks by trying to make it seem that the company did not discriminate against me because as a Black employee, I was "promoted" to a better paying position, the Credit Reporting Risk Analyst position. My W-2s and compensation record, however, will prove that their argument was pure boloney. With that said, in terms of earnings, my Credit Reporting Risk Analyst position in Khavin's group would have been a demotion for me.

81. I had to negotiate my Credit Reporting Risk Analyst position salary based on my previous Energy Confirmations Drafting Analyst salary as the salary they were initially offering me for my Credit Reporting Risk Analyst position was unacceptable. Their offer was on average $10,000 per year less than my previous years' salaries. I could not go that low but, because I had found the position to be desirable as it was advertised and presented to me, I accepted the offer at $7,000 less per year than what I was used to making in recent previous years due to my eligibility for overtime pay. At the time I accepted the offer, however, being naïve, I did not know that Khavin was a racist.

82. HR and Defendant Vega were well aware that the face value of my Credit Reporting Risk Analyst position salary was not and could not be representative of a "promotion" as they had full access to my complete compensation record. So, for them to attempt to use my said salary as a cover-up for JPMorgan Chase's culture of racial discrimination against Blacks when they knew better was despicable.

**COMPLAINT**

## I. **The Leverage JPMorgan Chase's Racist Managers Have Over Promotion and Compensation**

83.     Contrary to what the company may try to portray in that promotion and compensation decisions are made on a "committee" basis, individually, JPMorgan Chase's managers have extensive leverage over promotion decisions and compensation such as raises and bonuses. And, if particular managers engage in the intentional infliction of career regression and career stagnation on the basis of race like my previous manager, Defendant Sullivan and previous skip level manager, Defendant Liasis did then a Black employee like myself will get little to no increase in salary or a very minimal annual bonus. Under my previous manager, Sullivan and previous skip level manager, Liasis, I started working in the department on August 20, 2012 but I did not get a raise until February 1, 2014 – 18 months after I started working there. That raise was 1% of my salary; 1% after 18 months on the job. The bonus which was totally at the discretion of Sullivan and Liasis that I was given after 18 months of working in the department was the same amount that was given to me as what I would term a "welcome bonus" when I was on the job for only four months. The decision for the "welcome bonus" was made by a previous skip level manager, Mary Joyce Angioli who was reassigned to another department in January 2013 at which time Liasis became my new skip level manager. (See more in "Sixth Cause of Action - Intentional Infliction of Career Regression and Career Stagnation on the Basis of Race in Violation of Title VII of the Civil Rights Act of 1964".)

84.     In a conversation I had in January 2014 (on the day of the 2014 compensation meeting for each individual in the Energy Confirmations department) with one of my former Black co-workers (one of the two I mentioned in # 27 of my "Statements of Claim" that got the same treatment I did from Sullivan and Liasis), referring to the annual bonus and raise, she complained to me that "*every year they screw me over.*" Again, the bonus and raise were at Sullivan and Liasis' (both White) discretion. I did not go into further detail with her on that matter but at the time, she had been with

the company for over 18 years and even though she was a valuable employee, she was only at the Associate level.

85. In Khavin's group, prior to me, the only Black analyst to have joined the team, Khavin refused to promote Shillingford to a managerial position (more on this in "Ninth Cause of Action - Unwillingness/Failure to Promote to a Managerial Position on the Basis of Race"). So again, with the leverage over promotion and compensation that JPMorgan Chase gives to its vast majority of non-Black managers, the culture of racial discrimination at the company is fertile. As, if these said managers have racist motives against Blacks, as it was in my case, they will use that leverage to discriminate against Black employees and/or use it to use other Black employees as conduits for their racial discrimination.

## EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES

86. On August 13, 2015, I filed a timely charge with the Equal Employment Opportunity Commission ("EEOC") pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin) regarding Defendants' alleged discriminatory conduct. I was issued a Right to Sue letter which I received on February 13, 2016. A true and correct copy of the EEOC Right to Sue letter is attached (EXHIBIT J).

## FIRST CAUSE OF ACTION

**Unlawful Discrimination on the Basis of Race in Violation of Title VII of the Civil Rights Act of 1964**

**(Against Defendants JPMorgan Chase, Khavin, Shillingford, Sullivan, Liasis and Does 1-10)**

87. I hereby repeat, reallege and incorporate each foregoing and subsequent paragraph of this Complaint as though fully set forth herein and further allege as follows:

COMPLAINT

88. Working at JPMorgan Chase under circumstances where it was a constant fight to protect my dignity and to defend my integrity and my reputation solely because of my race was not only very challenging but was in violation of Title VII of the Civil Rights Act of 1964. Simply put, being treated as the house slave, being assigned a manager who was willing to engage in horizontal racism for her own job security and having managers who engaged in the intentional infliction of career regression and career stagnation and defamation of character on the basis of my race were unlawful and discriminatory acts against me by JPMorgan Chase and its managers.

89. As the only Black analyst on Khavin's team, for standing up against disparate treatment against me for being treated as a house slave reminiscent of the 1800s plantation style era of slavery, I was harassed on a monthly basis, I was falsely accused of poor performance and put on a retaliatory "performance improvement plan" and in continuance of my stance, two months later was given a "written warning" and ultimately terminated on January 6, 2016.

90. It was a discriminatory act by Alex Khavin to have ordered solely me to do the degrading and demeaning task of printing, collating, stapling and lugging to the group's monthly meeting, the presentation materials of each of the non-Black team members, a task that was never asked of any of the non-Black analysts or associates on the team to do for the two years prior to me joining the team or even during my tenure and a task that would have never been reciprocated by any of the said non-Black analysts or associates to benefit me, the only Black analyst on the team. As if I were the house slave, Khavin also ordered me to search through my emails for presentation materials sent by the team, open each email sent, pull the attachments and put all those attachments together in one email to make the task of getting these attachments *"easier"* (less work) for the non-Black team members while making it **three times** more work for me, the Black analyst, to do. Also, as a perk to lessen the responsibilities of the non-Black analysts and associates, after two years of rotating the taking of the monthly team meeting minutes among the said non-Black analysts and associates, Khavin made the change to make that task no longer rotational but to be solely my job.

**COMPLAINT**

91.     The foregoing are tasks that Khavin had never even assigned to the White administrative assistant on the team to do.   In fact, as evidence of the disparity in how Khavin treated me versus how she treated the non-Black analysts and associates in the group, when I complained to her on April 24, 2015 about her disparate treatment against me based on the discriminatory and demeaning tasks she assigned solely to me, Khavin's "how dare you", condescending, unapologetic and unrepentant response to me was, "*it is your job and I expect you to do it.  If you need help go and ask the [White administrative assistant] to help you*".  Khavin refused or failed to instruct me to ask help of any of the non-Black analysts in my own job category or on my same job level.  However, she, in her act of lack of respect and disparate treatment against Blacks instructed me to go and ask the White administrative assistant to help me, an analyst, to do a task that would more likely fall into the administrative assistant's job category.  Also, please note that Khavin herself had never given the White administrative assistant the directive to provide me with this help.

92.     There was no other reason besides Alex Khavin's bigotry against Blacks to explain this disparity.  Having graduated Summa Cum Laude from college, like every other analyst on the team, I met the educational requirements for the job (a strong academic performance was one of the job requirements).  It was not like I had more time on my hands than the other non-Black analysts because, because of the overwhelming amount of work that my job entailed, for more than half of the month my average time to leave work was 8:00 pm and for the rest of the time, there was a possibility, not a guarantee, that I could have gotten to leave between 6:00 and 6:30 pm (extremely rare for 6:00 pm) when the average time for the whole month for the non-Black analysts and associates to leave work was between 5:00 and 5:30 pm.  It could not have been that it was because I was the last one to join the team because a non-Black analyst joined the team just one week before I did, two more non-Black analysts joined the team in August 2015, nine months after I did, another non-Black analyst joined the team in September 2015, ten months after I did and these clerical tasks were still assigned solely to me (EXHIBIT K – email dated October 21, 2015).

**COMPLAINT**

93.     I was put on a "performance improvement plan" and issued a "written warning" for standing up against JPMorgan Chase and its managers' disparate treatment against me on the basis of my race. Both of these punishments were in retaliation of this said stance, a stance that none of the non-Black analysts and associates ever had to take as they were never subjected to the disparate kinds of treatment I, a Black employee was subjected to and had to endure. The severe punishments of being put on a retaliatory and pretextual "performance improvement plan" and given a "written warning" automatically disqualified me from access to all of the company's progressive benefits. As, as #2 of the "Employee's Acknowledgement" on the "written warning" (EXHIBIT F) states, *"I am not eligible to receive a promotion or transfer, or to apply for tuition assistance or a position through job posting during the written warning restrictions period specified above. In addition, this written warning may affect any incentive pay or bonus I may be eligible to receive."*

94.     Under my previous manager, Defendant Sullivan and previous skip level manager, Defendant Liasis, as a Black employee, I was intentionally inflicted with the unlawful and discriminatory acts of career regression and career stagnation and defamation of character on the basis of my race. My experience under their management was like that of an ambitious slave who had tried many times to escape from her captivity but kept getting recaptured and punished by her master. (See more in Sixth Cause of Action – "Intentional Infliction of Career Regression and Career Stagnation" and Tenth Cause of Action – "Defamation of Character" on the Basis of Race in Violation of Title VII of the Civil Rights Act of 1964.)

95.     As a result of Defendants' discriminatory acts and unlawful retaliation against me, I suffered significant loss of vital employment benefits. Such benefits included not being eligible for the company's tuition assistance program whereby I was denied access to the benefit of sponsorship and financial assistance with the CFA exams. The Chartered Financial Analyst (CFA) Certification is a big boost to one's financial career growth and it was a benefit that most of the non-Black analysts and associates on the team were taking or had taken advantage of. I also suffered and

- 44 -

continue to sustain substantial losses in earnings, the derailment of my financial career in the financial industry, emotional, physical and mental injuries and loss of reputation. My damages are in excess of $75 million, to be determined according to proof at trial.

96.     The aforementioned acts of Defendants were malicious, rancorous, willful, oppressive, despicable, in violation of Title VII of the Civil Rights Act of 1964 and without regard to the resulting harm to me. I am therefore entitled to punitive damages in an amount sufficient to punish JPMorgan Chase – a multi-billion dollar company and its managers and make an example of them.

## SECOND CAUSE OF ACTION

**Unlawful Retaliation on the Basis of Race in Violation of Title VII of the Civil Rights Act of 1964**

**(Against Defendants JPMorgan Chase, Khavin, Dubowy, Poz, Shillingford and Does 1-10)**

97.     I hereby repeat, reallege and incorporate each foregoing and subsequent paragraph of this Complaint as though fully set forth herein and further allege as follows:

98.     For taking a stance against the unlawful act of racial discrimination through peaceful defiance and by filing a charge against JPMorgan Chase with the Equal Employment Opportunity Commission (EEOC) for the said unlawful act, I was severely punished by JPMorgan Chase and its managers. These severe punishments included being placed on a retaliatory and pretextual "performance improvement plan" on July 30, 2015 (EXHIBIT C), issued a "written warning" on September 24, 2015 (EXHIBIT F) and ultimately terminated on January 6, 2016.

99.     In an August 3, 2015 email response (EXHIBIT C) to the aforesaid retaliatory and pretextual "performance improvement plan", I started out by saying, *"Since I was raised in a household where TRUTH matters, I will not compromise my dignity to fully respond to or to sign off on the malicious and mendacious comments you* (Shillingford) *have made about me and my work in your PDF attachment* (the "performance improvement plan"). *These are fabricated comments made about me in retaliation for me speaking up and complaining about racial discrimination against me to HR"*.

**COMPLAINT**

As stated, I did not fully respond to the "performance improvement plan" comments in the said email response but I will now painstakingly expose how disingenuous, rancorous, malicious and mendacious the retaliatory comments in the said "performance improvement plan" really are.

100.    However, before I do that, I would like to add that besides the fact that I am usually a very detailed person, because of the nature of the environment in which I worked, I did a lot of what they call "CYAing" in corporate.  With that said, I sent a lot of emails in representation of my work which will reflect the quality of work I produced or was able to produce working for JPMorgan Chase.  All those emails should still be stored away on a server at JPMorgan Chase.  So, I implore and to some extent challenge JPMorgan Chase to release all of those said emails in defense of their charge of "performance issues" against me.  Also, on October 26, 2015, as requested, I completed and submitted a summary of my 2015 contribution to the Counterparty Risk Group and to the company as a whole (EXHIBIT G – 2015 Final Analyst/Associate Evaluation).  I also updated the "Employee" sections of my 2015 year end performance review on October 21, 2015 and completed doing so on December 17, 2015 (EXHIBIT G – 2015 Performance Review – pages 4, 5, 6 & 7).  However, up to January 5, 2016, the day before my retaliatory termination, under the sections marked "Manager's Comments" on my said 2015 year end performance review, the statuses were *"There are no comments available from the manager"*.  Why did Shillingford go mum?  What was she afraid of?  My *"unprofessional tone"* in refuting in writing any fabricated, malicious and/or mendacious comments she might put on my permanent work record?  Or, is it just that there was **no way** that she could **put in writing** that I did not meet my job expectations?  Hopefully she will be willing to speak on that behalf under penalty of perjury.  I will now go straight into painstakingly refuting the said retaliatory and pretextual "performance improvement plan" (EXHIBIT C).

101.    The refutation of the comment in section 1 of the "performance improvement plan" (***"she has not taken on all tasks assigned to her"***):  As I said in paragraph 6 of my August 3, 2015 email response (EXHIBIT C), *"The ONLY tasks I have refused to take on are the tasks I noted when I*

*reported racial discrimination against me to HR.* (The tasks of being the house slave for the non-Black employees on the team.)" In further refutation of this comment, I will use the statement Shillingford wrote on my 2014 year end performance review less than one month before it became fully apparent to me that I was being designated by Khavin as the team's house slave: *"Candice has hit the ground running in this new role. She has been very hands-on and follows up on outstanding issues; additionally, Candice is willing to take on new responsibilities with a can-do-attitude."* (Exhibit G – 2014 Performance Review - Page 11 - 31-DEC-2014) Again, the only tasks that I had not taken on which were assigned to me were the tasks reminiscent of the 1800s plantation style living, in the era of slavery when Blacks had to serve their masters and their masters' families. By discriminatively treating me as if I was a house slave, Khavin humiliatingly assigned me the task of printing, collating, stapling and lugging to the group's monthly meeting, the presentation materials (times 13) of each of the non-Black team members and the putting of meeting presentation attachments together in one email to make work *"easier"* for the said non-Black team members. These were tasks that were not assigned to the White administrative assistant on staff to do and tasks that none of the non-Black analysts was ever assigned to do.

101a. The refutation of the comment also in section 1 (*"unable to deliver in the anticipated timeframe without errors"*): First off, Shillingford was trying to mask or to diminish the fact that I **was** able to deliver in **"the anticipated timeframe"** by adding "without errors" to her statement. When dealing with large volumes of data and complex Excel formulas coupled with an overwhelming amount of data quality issues and constant rush to satisfy unrealistic demands and deadlines, understandably, anyone can manually transfer or input an incorrect value from one data source into another. However, even if 99% of my work was "without errors", Shillingford would still have a debasing comment to make. For this said reason, in an email I sent to her on October 15, 2015 with a copy to Defendant Poz, I wrote, *"You are a very unfair person and yes, knowing the numerous data quality issues that we experience for which I have self-identified, investigated,*

*prepared analysis for and escalated to the Tech team, if there is a very minimal or ONE oversight, you do not need to unfairly give the impression for me to be seen as being incompetent. Please bear in mind that unlike you, the company understands that there is a propensity that incidents of oversight will happen whether with you, me or anybody and that is why per the company's protocol, a second reviewer is required.*" In this case, Shillingford was the second reviewer. As I said in # 20 of the "Statements of Claim": "*Shillingford's behavior and attitude in enforcing Khavin's bigotry against me was reminiscent of the epitome of being a "slave master's pet" in the era of slavery. Her behavior and attitude were that of a slave that his master had found favor with to carry out the lashing, etc. of the other slaves on the slave master's behalf.* "

101b. No one is immune to errors. Simple things like data refreshing issues in Excel and/or PowerPoint could have caused an error. That is why I took the initiative, no one asked/told me to do this, but as a team player, I took the initiative to employ data validation techniques to prevent errors from occurring. I outlined an example of one of these validation techniques in a six page document which I sent via email to members of the credit risk reporting team including Shillingford and also saved it on the team's shared drive for access to all. But, with Shillingford being a horizontal racist, unless I make mention of them, these types of efforts on my part (EXHIBIT G – 2015 Final Analyst/Associate Evaluation) would have never seen the light of day on my performance reviews.

101c. To further expose how disingenuous, rancorous, malicious and mendacious this retaliatory comment "***unable to deliver in the anticipated timeframe without errors***" is, the main reason for errors which had been recognized and acknowledged by management was data quality issues whereby incorrect or inconsistent data was sent to us. For this, I employed taking more time to conduct due diligence to mitigate the risk for errors by self-identifying, investigating, preparing analyses for and escalating all abnormalities to the Tech Team. That is why it is so disingenuous of Shillingford to state in section 2 of the said "performance improvement plan" that "***previous***

**COMPLAINT**

*analysts who performed the job were able to solely perform the tasks within the time period at a point when it was much less streamlined (very manual)* ".

101d.  The Tech Team was working on making the process of my work more streamlined by moving it over to an automated system.  However, there were so many data quality issues associated with this automation that manual intervention was not only still required but it was necessary.  So, not only did I have to implement due diligence to still **manually** check for data and calculation errors but, if or when I detected those errors, I had to take the time to conduct time consuming and sometimes tedious investigations, prepare analyses of my findings then send those analyses which could comprise of up to three email pages to the Tech Team to resolve data quality issues and where necessary, conducted follow ups whether verbally, via the company's instant messenger application or via additional emails.  The data quality management as it related to the automation of my work was primarily my task to do, a task that *"previous analysts who performed the job"* minimally did or minimally had to do.  It was through **my due diligence and the integrity of the work that I produced**, that many of these data quality issues came to light.  With that said, Shillingford had to escalate the data quality issue matter to Philippe Quix, the Global Investment Management Chief Risk Officer/Managing Director/Khavin's manager in a meeting held on November 17, 2015 at 12:15 pm and Quix had to schedule subsequent meetings with other senior level managers to address the issue.

101e.  Just to quickly touch back on *"unable to deliver in the anticipated timeframe without errors"*, too often than not, I had to point out to Shillingford whether via print screenshots or with email evidence that an error was caused by her in terms of information she passed on to me or for other reasons.  Things had gotten so bad with her trying to blame me for her own errors that I had to implement a system whereby just about everything she told me had to be in email.  (See less compromising proofs of Shillingford's tendency to fabricate things against me in Exhibit Q.)

**COMPLAINT**

101f.   To elaborate a bit on my work with the Tech Team especially as it relates to this retaliatory and pretextual "performance improvement plan' on which I was placed, the Counterparty Risk Group is very dependent on the Tech Team and I was the key liaison for the exposure reporting for the said Tech Team.  In light of this interaction, the Tech Team including its head was exposed to the quality of my work which included my data quality issue analyses, my investigations and escalations, my testing of system enhancements and data validations, my communication skills, my work ethic and approachability, etc.  With that said, I once again implore and to some extent challenge JPMorgan Chase to have these employees testify under oath in defense of their charge of "performance issues" against me that led to my firing on January 6, 2016.

102.   The refutation of the comment in section 1 ("***putting additional stress on the team as other team members are performing duties assigned to her***"):  The first time I heard or saw anything in regards to this fabricated comment was on the said fabricated "performance improvement plan".  Only the **one** disgruntled team member who I wrote about in # 73 who was officially assigned as a "*half a person*" after numerous requests for an additional human resource, temporarily performed any duty that was assigned to me.  Yes, he was stressed/disgruntled because as I said in response to this comment in paragraph 3 of EXHIBIT C of my August 3, 2015 email response, "*The "half a person" is stressed because he wants to move on from doing reporting work and may I respectfully say, working with you* (Shillingford).  *His new position is now or should be that of a credit risk analyst on the Credit Analysis side.  I would have been stressed too if I were him.  In how many meetings and one on ones have I raised the obvious issue of the need for additional human resources to you?  In how many of these meetings did you agree with what I had to say (whether or not you were being disingenuous) until you were told that you will not be provided with any additional resource and then you ultimately got "half a person"?*"

102a.  Shillingford's comment on the fallacious, retaliatory and pretextual "performance improvement plan": "***putting additional stress on the team as other team members are performing***

*duties assigned to her*" was another untrue statement concocted by her and JPMorgan Chase's HR representatives to rationalize their unlawful retaliation against me for speaking up against their racial discrimination of disparate treatment against Blacks.

103.     The refutation of the comment in section 1 ("*from my observation and per feedback from team members, Candice is inflexible and not open to feedback*"):   Shillingford's "feedback" comprised of enforcing Khavin's bigotry against Blacks against me.  Her "feedback" during my initial complaints to her of Khavin's disparate treatment against me was to try to convince me to do everything that Khavin told me to do without complaining, in other words, to accept Khavin's second class treatment.   Shillingford also told me/gave me "feedback" that I should take on additional backup work on my already overload of work (backup work that should have been done by the non-Black team members) so as to impress the said non-Black team members to make my "performance improvement plan" review favorable.   No wonder there was an obvious lack of respect for Shillingford by these team members.  I have never and would have never stooped that low.  I was all ears for and have always been all ears for constructive feedbacks.  However, in the mid-year performance review meeting in which Shillingford presented me with the "performance improvement plan", when asked by me, Shillingford could not come up with one example of a feedback (besides me, the Black analyst, rejecting the disparate, discriminatory treatment against me to put meeting presentation attachments together in one email to make work "*easier*" for the non-Black team members and to print, collate, staple and lug the said non-Black team members' presentation materials to the monthly meeting) that her and/or the team members said I was "*inflexible and not open to.*"

104.     Shillingford further wrote in section 2 of her "performance improvement plan" that, "*She needs to learn to efficiently manage her work in order to deliver on the exposure report and monthly reconciliation in the anticipated timeframe and without errors*".  What I wrote in # 101a through # 101f was in regards to the "*exposure report*" but with regards to "*monthly*

*reconciliation*" also known as the *"reconciliation report"*, in a conversation I overheard among three of my co-workers on the afternoon of September 16, 2015 whereby they were talking about this said reconciliation report, the co-worker who had been with the team for more than two years was telling the other two new co-workers the following: *"I did the reconciliation report for a month. After that I said, I'm not doing this. You know, the reconciliation report that Candice works on. It's hard and complicated. After a month (laughs) I said, I'm not doing this anymore."* Also, the third of my three predecessors, the disgruntled one who "jumped ship" after working in my position for less than six months also confirmed in a conversation I had with him that he was never assigned the reconciliation report to do. However, since it was too much work for the non-Black analysts to do this report, Shillingford, the only Black person in the group (at the time), a vice president at that had to end up doing this report until I, the only Black analyst to have joined the group was hired.

105. So here we have a challenging report, the *"reconciliation report"*, that two non-Black analysts either refused to do or was not assigned to do because it would have been too much work for them just as how they were never assigned the demeaning and discriminatory tasks to put meeting presentation attachments together in one email to make work *"easier"* for the other team members and to print, collate, staple, and lug the presentation materials for the other team members, times 13, to the monthly meetings. However, these tasks were assigned to me and per Shillingford, I was expected ***"to learn to efficiently manage [my] work in order to deliver on the exposure report and monthly reconciliation in the anticipated timeframe and without errors"***. Again, Shillingford was trying to mask or to diminish the fact that I **was** able to deliver (yes, I had to work up to 8:00 pm or so) in **"the anticipated timeframe"** on **both** reports by adding "without errors" to her statement. As I said in # 20 of the "Statements of Claim": *"Shillingford's behavior and attitude in enforcing Khavin's bigotry against me was reminiscent of the epitome of being a "slave master's pet" in the era of slavery. Her behavior and attitude were that of a slave that his master had found favor with to carry out the lashing, etc. of the other slaves on the slave master's behalf. "*

COMPLAINT

106. The refutation of the comment in section 2 ("**Attitude/Professionalism: Feedback from team is consistent in terms of inappropriate tone of emails and verbal communication which comes across as hostile and not business appropriate**"): Khavin's disparate treatment against me on the basis of my race and Shillingford's enforcement of the said disparate treatment, as anyone could imagine, did create a hostile environment. Nonetheless, I still managed to be courteous and to maintain professionalism when dealing and/or communicating with members of the team as that is how I was raised. However, when I was getting nowhere with stopping Khavin and Shillingford from treating me as if I was the house slave, I sent this email to the team: "*In the interest of team spirit, can you please print, sort, organize and staple as well as send out your own presentation materials to the team? I find it unfair and demeaning that the task of printing, sorting, organizing, stapling, sending out and lugging YOUR presentation materials to the meetings is placed on me.*" (EXHIBIT B – email dated May 27, 2015) As for "**Candice needs to improve her communication specifically in regards to tone and professionalism**", in paragraph 5 of EXHIBIT C of my "performance improvement plan" August 3, 2015 email response, I stated: "*If you are referencing the emails in which I complained about being treated as the help (and I bet you are), I think my standing up has been misconstrued. In those emails I do write rhetorical questions such as "Am I the help? Is this 1910?" because of the demeaning treatment being meted out to me. Putting what you don't want to see in an email, the TRUTH, does not make the email unprofessional. Even though I've been discouraged by you (Shillingford) time and again not to put things in email, it is the means I use to protect myself from these vicious mendacities. Sadly, not even this means is teflon enough to do so. As long as what I write in these emails can be said under penalty of perjury, they should not be deemed unprofessional.*"

106a. With regards to Shillingford saying that: "**Feedback from team is consistent**", please note the 4th of my strengths that I listed on my 2015 year end performance review: "*My gossip free discipline that allows me to refrain from discussing team members' private, personal or*

*professional situations and/or issues with other team members to influence them or to gain favor from these said team members.*" Shillingford may want to consider adopting this strength.

107. In my 2015 mid-year performance review meeting in which I was presented with the "performance improvement plan", Shillingford verbalized to me that team members told her that I was "unapproachable". When I knotted my brows in shock and asked her "*how so?*" she told me that they told her that I looked overwhelmed. Well, if I am doing a job about which I was voluntarily informed by another team member and believe, and on that basis allege, that the first of my three predecessors had to go out on long term disability due to overwork, stress and the unrealistic expectation for one person to do a job that realistically requires two people to do, that the second of my three predecessors resigned after just two months on the job due to being overwhelmed with work and not having a work/life balance and the third of my three predecessors jumped ship after less than 6 months on the job, can't I be forgiven for "looking overwhelmed"? That would be used against me in terms of my approachability? In addition to that, I was consistently treated as if I was the house slave by Khavin and Shillingford. I am only human. I must have been overwhelmed in the hostile environment Khavin and Shillingford had created.

108. The refutation of the comment in section 3a ("***Perform assigned projects and tasks. Manager will monitor on a weekly basis***"): The **only** task that Shillingford needed to "*monitor*" and which she did, was the enforcement of Khavin's disparate and discriminatory treatment against me of treating me as if I was a house slave. As you can see per Shillingford's September 24, 2015 "Written Warning" (EXHIBIT F), her main emphasis and her only expectation was for me "*to print all materials for our monthly team meeting and provide copies for each member*". As it relates to other assigned projects and tasks (my actual work), there was **nothing** for her to "*monitor*". Even though I had to work under circumstances where it was a constant fight to protect my dignity and to defend my integrity and my reputation solely because of my race, I was able to competently execute my tasks.

**COMPLAINT**

109.    As I promised in # 99, I have painstakingly exposed how disingenuous, rancorous, malicious and mendacious the comments made by Shillingford on the retaliatory and pretextual "performance improvement plan" that I was placed on, really are. And, lest I forget, the "M-" rating that I was given (top right column), per Shillingford and Defendant Dubowy, who was also present at my July 30, 2015 mid year performance review, was "*a carryover*" of the performance rating that my previous manager, Defendant Sullivan, gave me on my 2014 year end performance review. When has it ever been heard of that the performance rating from another manager, from a totally different job, not to mention, a job that had been eliminated due to the sale of JPMorgan Chase's physical commodities business could be carried over to a new position? This is further proof that the farce "performance improvement plan" was an unlawful retaliatory and pretextual attempt by JPMorgan Chase, its HR department and its managers to cover up their racial discrimination against Blacks. And, by doing so, they maliciously defamed my character in an effort to discredit my claim of discriminatory and disparate treatment against Blacks against them.

110.    As a result of Defendants' discriminatory and unlawful retaliatory conduct against me, I suffered significant loss of vital employment benefits. Such benefits included not being eligible for the company's tuition assistance program whereby I was denied access to the benefit of sponsorship and financial assistance with the CFA exams. The Chartered Financial Analyst (CFA) Certification is a big boost to one's financial career growth and it was a benefit that most of the non-Black analysts and associates on the team were taking or had taken advantage of. I also suffered and continue to sustain substantial losses in earnings, the derailment of my financial career in the financial industry, emotional, physical and mental injuries and loss of reputation. My damages are in excess of $75 million, to be determined according to proof at trial.

111.    The aforementioned acts of Defendants were malicious, rancorous, willful, oppressive, despicable, in violation of Title VII of the Civil Rights Act of 1964 and without regard to the resulting harm to me. I am therefore entitled to punitive damages in an amount sufficient to punish

**COMPLAINT**

JPMorgan Chase – a multi-billion dollar company, its HR representative and its managers and make an example of them.

## THIRD CAUSE OF ACTION

### Aiding and Abetting Title VII of the Civil Rights Act of 1964 Violations

### (Against Defendants JPMorgan Chase, Vega, Dubowy, Poz and Does 1-10)

112.    I hereby repeat, reallege and incorporate each foregoing and subsequent paragraph of this Complaint as though fully set forth herein and further allege as follows:

113.    On May 27, 2015 I received an Outlook invite for June 2, 2015 from Terri Vernon who worked in JPMorgan Chase's HR department to *"discuss concerns regarding my manager and job responsibilities."* This invite was in response to Shillingford reporting me to HR for "refusing to do the work assigned to me" with no reason for my refusal even though for months I had been telling Shillingford and/or Khavin that *"I feel as if Alex Khavin has been treating me as if I am the help, as if it is 1910".* I accepted the said invite then with a follow up email on May 29, 2015, I took the opportunity to not only report to Terri Vernon that I felt that I was a victim of racial discrimination but in preparation for our conference call on June 2, 2015, I provided her with documents in support of my claim (EXHIBIT E).  In response to my May 29, 2015 correspondence, during our conference call, Terri Vernon advised me that [as per protocol] she would be escalating my discrimination claim to the Corporate Employee Relations Department that deals with such complaints.  I requested that she pass on the documents I provided her in support of my claim to the person to whom she would be escalating my claim and she concurred.  My claim was escalated to Defendant John Vega and on July 8, 2015 I had my first in-person meeting with him.

114.    In our first meeting, I confirmed with Vega that he had received all the supporting documents regarding my claim.  He said the said documents were *"disturbing"*.  I also articulated everything in EXHIBIT A – EEOC Intake Questionnaire – Question # 6 to him.  I spoke with him

**COMPLAINT**

about the disparate treatment on the basis of my race that was being meted out to me by Khavin with the help of Shillingford making sure to disclose at that point that Shillingford is Black. He told me that he was aware that Shillingford was a *"woman of color"* and tried to assure me, as an attorney by profession, I guess, that because Shillingford is also Black/*"woman of color"* that she could not be racist against me. I begged to differ but he was so much into doing his job of covering up JPMorgan Chase's and its managers' racial discrimination against Blacks that he was not having any part of my divergence. This reflexive or possibly premeditated defense and attitude from Vega proved that from inception he was prepared to aid and abet violations of Title VII of the Civil Rights Act of 1964. The said defense and attitude were also the obvious cover that Khavin used to extend, through Shillingford, her racial discrimination against Blacks, against me.

115. I explicitly told Vega that *"I feel as if Alex Khavin has been treating me as if I am the help, as if it is 1910"* with a full explanation as articulated throughout this Complaint and as written in the supporting documents regarding my claim that were provided to him. I then confirmed with him that I felt that Khavin's discriminatory treatment against me was reminiscent of the 1800s plantation style living, in the era of slavery when Blacks had to serve their masters and their masters' families. I told Vega about the disparate treatment against me as it related to the company's "work from home" benefit. I told him about Khavin's unwillingness to promote Shillingford, who is Black, to a managerial position prior to me, a Black person, joining the team and of Khavin switching my manager from Kim Dauber who is White to Shillingford after it was decided that I was the one chosen for the position. I then provided him with an explanation as to why, in good faith, I believed that Khavin switching the manager after it was determined that I was chosen to be hired for the position was in consistence with unlawful segregation. However, not only did Vega, in defense of Khavin, downplay my explanation but he tried to trap me into providing him with a screenshot of my job description which was still available on JobConnect, the online portal JPMorgan Chase uses for job opportunities and which at the time of Vega's screenshot request, July 23, 2015 was stating

Fidelia Shillingford as the hiring manager. Based on ensuing correspondence, Vega seemed to have thought that he could have dispelled my claim of Khavin switching my manager in consistence with unlawful segregation if no evidence other than Fidelia Shillingford being listed as the hiring manager on the job description on JobConnect could have been provided. His quick response to me after sending him the requested screenshot was, *"Thank you, Candice. Do you notice whose name is listed below as the hiring manager? It's not Kim, but Fidelia."* After shaking my head a few times, I responded with a smiley face and said, *"I do. However, I do have the original one with the date where it indicates Kim as the hiring manager. I will provide that to you."* (EXHIBIT N) I sent Vega the promised document from home that night. My response to his devious act in his quest to aid and abet in Title VII of the Civil Rights Act of 1964 violations was, *"As promised, attached is not one but two copies of my job description showing Kim Dauber as the hiring manager as of 10/23/2014 and 10/29/2014. I even have one dated 10/27/2014 (EXHIBIT H). Also, I am not quite sure as to whether or not you were trying to test my credibility by your request and your email response so I have taken the liberty to also attach the trail of email correspondence up to my first meeting on 10/29/2014 with Kim as my prospective manager. My last email correspondence with her as my prospective manager was to set up the interview for me to meet with Alex Khavin on Monday, November 3, 2014 (EXHIBIT O). Throughout this time, Kim spoke with me as if, like all the other analysts and associates, she expected to be my manager and never once mentioned even the possibility of Fidelia Shillingford being my manager. When I interviewed with Fidelia on October 30, 2014, she spoke with me as if I would be working with her like the previous analysts did and in no way, shape or form as if she would be my manager. And, in my interview with Alex (Khavin) on November 3, 2014, she made no mention of any possible manager change either. It was not until Thursday, November 6, 2014 when I received my confirmation letter from HR (also see attached) that I found out."* (EXHIBIT N)

116. Defendant Vega to whom my claim of racial discrimination was escalated as per JPMorgan Chase's protocol did everything in his power to cover up the unlawful and discriminatory acts of JPMorgan Chase's managers which resulted in him aiding and abetting in Title VII of the Civil Rights Act of 1964 violations. He went as far as to tell me that the demeaning and discriminatory task of me printing, collating, stapling and lugging the non-Black team members' presentation materials to the monthly team meeting was my job to do by making reference to the latter part of job responsibility: *"Contributing to team-wide efforts such as risk assessment methodology enhancements, portfolio-wide reviews and **preparing management presentations**"* on my job description. Obviously, he was not aware that this said job responsibility of *"preparing management presentations"* was listed on the job descriptions of **all** the other analysts and associates as well. (See Factual Allegations C # 59 – "Job Description - Counterparty Credit Risk Analyst".) As, these are the presentations we make to management in the monthly meetings. Vega making this faux pas by referencing this job responsibility as the reason why Khavin assigned the previously stated demeaning and discriminatory task to me alone, the only Black analyst on the team, was one of his ways in helping to cover up Khavin's unlawful racial discrimination against Blacks thus aiding and abetting Title VII of the Civil Rights Act of 1964 violations.

117. As Vega was supposedly going to do a full investigation of my racial discrimination claim, he made additional requests and requested additional documents from me, all of which were provided without delay. However, with all the evidence provided including the chronology of events of racial discrimination against me (EXHIBIT N) that Vega requested, on our "conclusion of investigation" conference call on July 29, 2015, all Vega's findings in the matter consisted of was his pretextual and fabricated charges against me as he *"was told by Alex Khavin and Fidelia Shillingford"*. In aiding and abetting Title VII of the Civil Rights Act of 1964 violations, Vega sided with Khavin and Shillingford. And, in his quest to cover up for JPMorgan Chase and its racist managers, he told me that per his findings he saw *"nothing discriminatory"*. Then, in the same

condescending, unapologetic and unrepentant tone as Khavin and in reminiscence of the 1800s plantation style living where slaves were ordered by force, he vehemently ordered me saying, *"when it comes time to get everything ready for the monthly meeting, get it* [the non-Blacks' printing, etc.] *ready so as not to derail your career here* [JPMorgan Chase]". In other words, turn a blind eye to the racial discrimination against you and your financial career at JPMorgan Chase will be just fine. He also warned me that if I continued to go down this path [of making racial discrimination complaints], *"this will quite frankly lead you down a path that will ultimately derail your career ."*

118.    For the two in-person meetings and the final conclusion one I had via a conference call with Vega, he was continuously on Khavin and Shillingford's sides. When he was not rationalizing for their unlawful, discriminatory behavior, as an attorney by profession, he was trying to twist my mind. He even went as far as to tell me or to deter me from reporting the matter to Local, State or Federal authorities when he made judgment on my racial discrimination claim by telling me that he worked for the New York State Division of Human Rights so based on his experience, and I paraphrase, "you basically don't have a case". How many other victims of racial discrimination has he used this tactic on to deter them from bringing discriminatory claims against JPMorgan Chase?

119.    In aiding and abetting Title VII of the Civil Rights Act of 1964 violations, Defendant Helen Dubowy, an Executive Director & HR Business Partner at JPMorgan Chase oversaw the unlawful retaliation against me after I raised the claim of racial discrimination against me to HR. As outlined in "Factual Allegations D", as cover for Khavin's discriminatory acts, instead of Khavin, Dubowy was present with Shillingford at my 2015 mid-year performance review at which I was presented with a fallacious, retaliatory and pretextual "performance improvement plan" on which Shillingford fabricated things about my performance in retaliation of me raising the issue of racial discrimination against me to HR. Per Dubowy, *"Alex* (Khavin) *couldn't be here. I'm here to make sure things go smoothly."* Dubowy whom I had never met before or with whom I had never even done an email

correspondence was supporting everything that was purported on the said fallacious, pretextual and retaliatory "performance improvement plan" as if she had had previous experience working with me in any capacity. In aiding and abetting Title VII of the Civil Rights Act of 1964 violations, she emphasized and sided with Shillingford and Khavin that the demeaning and discriminatory tasks that Khavin disparately assigned to me alone, the only Black analyst on the team, were my job to do. These were the said tasks I reported to JPMorgan Chase's HR department as disparate treatment against me as no other analyst or associate in the two years prior to me joining the team or after I joined the team was ever asked or got punished to do. As stated in Factual Allegations D - "JPMorgan Chase, Its Managers and Its HR Department's Retaliation against Me and Their Scheme to Cover Up Khavin's Discrimination Against Blacks", *"Defendant Helen Dubowy's attendance at my July 30, 2015 mid-year performance review was a pre-planned, pre-arranged and well thought out ploy to unlawfully retaliate against me and to unlawfully cover up Khavin's racial discrimination against Blacks by making sure that Khavin, the initial, and at the time, formally accused perpetrator of the bigotry against me was not present at my 2015 mid-year performance review."* Helen Dubowy's actions of covering for Khavin's racial discrimination against Blacks and overseeing the unlawful retaliation against me by way of the fallacious and pretextual "performance improvement plan" on which I was placed were consistent with aiding and abetting in Title VII of the Civil Rights Act of 1964 violations.

120.  Defendant Poz was not only present at the meeting on September 24, 2015 when Shillingford served me with a written warning (EXHIBIT F) with the "expectation", *"It is my expectation that Candice perform the job responsibilities for which she was hired; she is expected to print all materials for our monthly team meeting and provide copies for each member"* (meaning that I am **expected** to be the team's help or the house slave) but Poz was also vehemently enforcing the "expectation" that Shillingford put forth in her written warning including telling me that if I do not comply, I could be terminated. The fact that none of the non-Black analysts or associates had

**COMPLAINT**

ever had this duty assigned to them and also that they were off limits for me to even ask them to help me with this task as per Khavin's advice to me in our April 24, 2015 meeting *"if you need help go and ask the [White administrative assistant] to help you"* (not any of my fellow non-Black analysts) when I told her that I felt as if she was treating me *"as if I am the help, as if this is 1910"* prove that the "expectation" of Shillingford's written warning constitutes unlawful disparate treatment against me, the only Black analyst on the team, and Poz's enforcement of it was nothing short of aiding and abetting in Title VII of the Civil Rights Act of 1964 violations.

121.    The foregoing is clear as day that John Vega, an attorney by profession who was employed by JPMorgan Chase to intervene in discriminatory claims brought against the company by its employees, Helen Dubowy, an Executive Director & HR Business Partner also employed by JPMorgan Chase who, based on the capacity in which she served should have known better and Thomas Poz, an Executive Director and the Interim Head of the Counterparty Risk Group for Global Investment Management were unlawfully aiding and abetting in Title VII of the Civil Rights Act of 1964 violations.

122.    As a result of Defendants' unlawful conduct, I suffered significant loss of vital employment benefits.  Such benefits included not being eligible for the company's tuition assistance program whereby I was denied access to the benefit of sponsorship and financial assistance with the CFA exams.  The Chartered Financial Analyst (CFA) Certification is a big boost to one's financial career growth and it was a benefit that most of the non-Black analysts and associates on the team were taking or had taken advantage of.  I also suffered and continue to sustain substantial losses in earnings, the derailment of my financial career in the financial industry, emotional, physical and mental injuries and loss of reputation.  My damages are in excess of $75 million, to be determined according to proof at trial.

123.    The aforementioned acts of Defendants were malicious, rancorous, willful, oppressive, despicable, in violation of Title VII of the Civil Rights Act of 1964 and without regard to the

resulting harm to me. I am therefore entitled to punitive damages in an amount sufficient to punish JPMorgan Chase – a multi-billion dollar company, its senior level manager and senior level HR representatives and make an example of them.

## FOURTH CAUSE OF ACTION

### Unlawful Harassment on the Basis of Race in Violation of Title VII of the Civil Rights Act of 1964

### (Against Defendants JPMorgan Chase, Khavin, Shillingford, Sullivan and Does 1-10)

124.    I hereby repeat, reallege and incorporate each foregoing and subsequent paragraph of this Complaint as though fully set forth herein and further allege as follows:

125.    Since January of 2015, whether verbally or via email, as the only Black Analyst on the team, I was consistently harassed by either Khavin or Shillingford or by both on a monthly basis whereby they vehemently, condescendingly, unapologetically and unrepentantly ordered me, as if I was a house slave, to do the demeaning and discriminatory tasks of printing, collating, stapling (times 13 - a copy for each team member) and lugging of the presentation materials for the non-Black team members to the monthly team meeting and of putting meeting presentation attachments together in one email to make work *"easier"* for the said non-Black team members.  These were tasks that were not only off limits for the non-Black analysts to do but they were even off limits for the White administrative assistant on staff to be asked to do.  The White administrative assistant was not even asked to print the agenda she prepared and sent out via email to the team for the said monthly team meeting.  But, printing 13 copies, one for each of the non-Black team members, of this said meeting agenda was a part of the demeaning and discriminatory printing task that Khavin assigned to me, a credit reporting risk analyst, to do.

126.    For each and every month since January of 2015, I was harassed and subjected to disparate treatment on the basis of my race in violation of Title VII of the Civil Rights Act of 1964 by Khavin,

a racist and/or Shillingford, a horizontal racist (she enforced Khavin's bigoted demands) because of my stance against them treating me as a house slave, reminiscent of the 1800s plantation style living, in the era of slavery when Blacks had to serve their masters and their masters' families. When I complained to Khavin and Shillingford about the unfairness of the demeaning tasks Khavin assigned only to me, their adamant response to me was *"it's your job and I expect you to do it."* (EXHIBIT B – written proof via email response dated May 27, 2015 from Alex Khavin) None of the non-Black analysts was ever subjected to this kind of harassment. None of them was ever harassed to do a task that would make work three times harder for them while making the said work *"easier"* for teammates, including teammates on their job level to do. I was harassingly asked/told by Khavin and Shillingford things like *"so you are not going to do it? There are other jobs out there. The job is at will. There is the door. If you don't want to do it, no one is holding you here."*

127. The unlawful harassment on the basis of my race by JPMorgan Chase's managers and my stance against it escalated to the point whereby I was unfairly placed on a retaliatory and pretextual "performance improvement plan" on July 30, 2015 (See "Second Cause of Action - Unlawful Retaliation on the Basis of Race in Violation of Title VII of the Civil Rights Act of 1964") and then on September 24, 2015 which is after the EEOC served notice of a charge upon JPMorgan Chase based on the race discrimination claim I filed with the EEOC against the company, I was given an ultimatum via a written warning (EXHIBIT F) with an "expectation" from Shillingford which stated, *"It is my expectation that Candice perform the job responsibilities for which she was hired; she is expected to print all materials for our monthly team meeting and provide copies for each member."*

128. As per my job description (EXHIBIT H), if this was a job responsibility *"for which [I] was hired"*, I would not have known that. As I wrote in my EEOC Intake Questionnaire – Question # 6, page 2, paragraph 5 (EXHIBIT A), *"during my interview, one of the questions that was asked of me was 'how do you feel about taking minutes at meetings?' Since this task was not listed on my job description (as it was an ad-hoc task rotated among all the analysts and associates, not assigned to*

*any one person), to ensure that I would be taking on an Analyst position and not an Analyst/Administrative Assistant position, I asked the interviewer if the taking of the minutes would solely be my duty. Her answer to me was 'no, the taking of the meeting minutes is rotated among all the analysts and associates in the group'. However, at this opportune time there was no mention of the printing, etc. of everyone on the team's presentation materials because that was non-existent."* For the two years prior to me joining the team, this responsibility/*"expectation"* was non-existent. Prior to my hire, this perk/benefit created by Khavin, the racist, and enforced as well as reinforced by Shillingford, the horizontal racist, was not available to the non-Black team members.

129.    Due to JPMorgan Chase, its HR department, its senior level managers and its high level executive's failure to prevent both Khavin and Shillingford from carrying out the discriminatory act of disparate treatment against me on the basis of my race, I was continually harassed on a monthly basis by Khavin and/or Shillingford. As I stated in my email dated September 25, 2015 to Shillingford on which Defendant Poz, Defendant Dubowy and Terri Vernon were copied (Exhibit F), *"it is including HR's failure to prevent these unlawful acts against me that has caused you (Shillingford) to continue to harass me on a monthly basis since Alex Khavin and/or cohorts subtly made it solely your (Shillingford) job to enforce the second class treatment against me whereby I am ordered to print, collate, staple and lug the presentation materials of each of the team members to the monthly meetings."*

130.    Shillingford's adamancy in enforcing that I do these demeaning and discriminatory tasks that had never been given to any of the non-Black analysts to do, directly links to the fact that as a Black person, Shillingford enabled and accepted second class treatment that was meted out to her in order to gain favor from Khavin and for her job security. Shillingford's continuous and relentless harassment was embedded in the fact that because I am Black like she is, I should also be subjected to and must accept the said second class treatment that was meted out to me. Thus, she harassed me on a monthly basis by enforcing Khavin's bigotry against Blacks, against me. Shillingford tried to

COMPLAINT

justify Khavin's bigotry against me by telling me in a meeting I had with her that *"I've been taking crap for years"* – at the time, she had been working for JPMorgan Chase for at least nine years.

131.    Khavin and Shillingford's unlawful harassment on a monthly basis had caused and continues to cause me mental, emotional and physical distress. It also caused me to lose the respect of the other team members as they saw me as the team's help - The Black one who was responsible to print, collate, staple, etc., their presentation materials and to lug those said materials to the monthly team meetings where they would be waiting to be served.

132.    As it has now become absolutely clear, it is the culture of JPMorgan Chase's managers to be racist against Blacks which includes harassing Blacks thus creating a hostile environment for Blacks. In my email complaint to Julie Johnson against my former manager, Defendant Michelle Sullivan, I started out by saying, *"This is a desperate plea for help. I was trying my hardest to pick up the pieces of my morale (please see my two year PMC history) and move forward to execute the duties of my new position which started on November 10, 2014 to the best of my ability. However, I continue to be hunted and haunted by my former manager, Michelle Sullivan who seems bent on derailing, smearing and destroying the financial career I've worked so hard to pursue."* (Exhibit D)

133.    To harass me, Sullivan was adamant that she provided the comments and performance rating for my 2014 year end performance review. No good intentioned manager would have fought tooth and nail to have her comments and performance rating put on a **former** subordinate's performance review unless that manager's vendetta was to harass the employee and based on Sullivan's nature, to do so on the basis of my race. Sullivan hunted and haunted me that I had to send a desperate plea for help to Julie Johnson who reported to John Donnelly, the Global Head of HR who reported to Jamie Dimon, JPMorgan Chase's chairman and CEO. And again, just like the complaint I made to HR about Khavin's racial discrimination against Blacks, the complaint I made to Julie Johnson about Sullivan's harassment was to no avail. HR representative, Nancy Sebastian who was assigned to do the "investigation" found nothing *"wrong/malicious"*.

COMPLAINT

134. As a result of Defendants' unlawful conduct of harassment on the basis of my race, I have suffered and continue to suffer emotional, physical and mental injuries, the derailment of my financial career in the financial industry, loss of reputation and employment benefits. My damages are in excess of $75 million, to be determined according to proof at trial.

135. The aforementioned acts of Defendants were malicious, rancorous, willful, oppressive, despicable, in violation of Title VII of the Civil Rights Act of 1964 and without regard to the resulting harm to me. I am therefore entitled to punitive damages in an amount sufficient to punish JPMorgan Chase – a multi-billion dollar company and its managers and make an example of them.

## FIFTH CAUSE OF ACTION

**Failure to Take Steps to Prevent Discrimination, Retaliation and Harassment in Violation of Title VII of the Civil Rights Act of 1964**

**(Against Defendants JPMorgan Chase, Quix, Poz, Dubowy, Vega and Does 1-10)**

136. I hereby repeat, reallege and incorporate each foregoing and subsequent paragraph of this Complaint as though fully set forth herein, and further allege as follows:

137. JPMorgan Chase's HR department is a farce and the HR representatives are only looking out for the best interest of the company whether it means making sure to not expose the racist culture within the company through unlawful retaliations, bogus investigations and cover-ups or to not take culpability for a manager willfully harassing an employee. Take for instance the 4 page complaint (Exhibit D) that I sent to Julie Johnson, who reported to John Donnelly whose title is Head of Human Resources/Executive Vice President reporting to Jamie Dimon, JPMorgan Chase's Chairman and CEO, about Defendant Sullivan and "*her* (Sullivan's) *reinforced help* [Defendant] *Chris Liasis*". After the "investigation" which was sanctioned by Julie Johnson was done, just like the "investigation" into Khavin's racial discriminatory acts against me, HR representative, Nancy Sebastian "*found nothing wrong/malicious*".

**COMPLAINT**

138.    The first time I raised the issue of Khavin racially discriminating against me by treating me *"as if I am the help and as if this is 1910"* was verbally to Shillingford on January 26, 2015 and thereafter and throughout the whole of 2015, had escalated the said matter as follows: once again to Shillingford, first in a meeting on April 23, 2015 then in an email dated April 24, 2015 (EXHIBIT B —RE: Minutes and Documents for Extended Team Meeting), to Khavin herself in a meeting I had with her on April 24, 2015, to Khavin's manager, Philippe Quix in an email trail dated May 27, 2015 on which I copied him (EXHIBIT B - RE: Monthly CRG Governance Meeting), to JPMorgan Chase's Human Resources Department via Terri Vernon on May 29, 2015 who escalated the matter, per JPMorgan Chase's protocol, to John Vega in the Corporate Employee Relations Department, the department that deals with such complaints (EXHIBIT E) and to John Donnelly whose title again, is Head of Human Resources/Executive Vice President.    John Donnelly who reported directly to Jamie Dimon, JPMorgan Chase's Chairman and CEO became aware of my racial discrimination complaint when I copied him on an email dated August 3, 2015 (EXHIBIT C) in which I complained about being retaliated against for complaining about racial discrimination against me. However, all my escalations were to no avail as all the aforementioned who were all in positions to rectify the issue either failed to take steps to prevent the unlawful racial discrimination, retaliation and harassment against me or they aided and abetted in the unlawful acts in violation of Title VII of the Civil Rights Act of 1964 (see Third Cause of Action - Aiding and Abetting Title VII of the Civil Rights Act of 1964 Violations).

139.    On January 6, 2016, within half an hour of Defendant Poz being appointed to take over Khavin's position as Head of the Counterparty Risk Group for Global Investment Management as announced in an email from Philippe Quix, he called me into a meeting with him and Shillingford and told me that my employment had been terminated with immediate effect with the reasons being 1) For repeatedly refusing to do tasks assigned to me (the discriminatory tasks of printing, collating, stapling and lugging to the group's monthly meeting, the presentation materials of each of the non-

Black team members and the putting of meeting presentation attachments together in one email to make work *"easier"* for the said non-Black team members), 2) Based on the retaliatory and pretextual "performance improvement plan" (EXHIBIT C) which I painstakingly refuted in Second Cause of Action – "Unlawful Retaliation on the Basis of Race in Violation of Title VII of the Civil Rights Act of 1964", 3) Based on my peaceful act of defiance of the Written Warning (EXHIBIT F) that was presented to me on September 24, 2015 with the expectation: *"It is my expectation that Candice perform the job responsibilities for which she was hired; she is expected to print all materials for our monthly team meeting and provide copies for each member"*, 4) Because JPMorgan Chase's management deemed the emails that I composed to expose their unlawful act of disparate treatment against Blacks to be *"unprofessional"* and 5) For being *"disrespectful"* to my horizontal racist manager, Shillingford. These reasons for terminating my employment as verbally outlined by Defendant Poz, who was also present in the meeting on September 24, 2015 in which Shillingford presented me with the Written Warning and who was also copied on various emails in which I expressed the blatant racial discrimination against me, show that not only did Poz fail as the newly minted Head of the Counterparty Risk Group for Global Investment Management to take steps to prevent the racial discrimination, retaliation and harassment in violation of Title VII of the Civil Rights Act of 1964 against me but he also aided, abetted and enforced them.

140.    As a result of Defendants' failure to take steps to prevent racial discrimination, retaliation and harassment in Violation of Title VII of the Civil Rights Act of 1964 against me, I have suffered and continue to suffer emotional, physical and mental injuries, the derailment of my financial career in the financial industry, loss of reputation and employment benefits. My damages are in excess of $75 million, to be determined according to proof at trial.

141.    The aforementioned acts of Defendants were malicious, rancorous, willful, oppressive, despicable, in violation of Title VII of the Civil Rights Act of 1964 and without regard to the resulting harm to me. I am therefore entitled to punitive damages in an amount sufficient to punish

**COMPLAINT**

JPMorgan Chase – a multi-billion dollar company, its senior level managers and high level HR representatives and make an example of them.

**SIXTH CAUSE OF ACTION**

**Intentional Infliction of Career Regression and Career Stagnation on the Basis of Race in Violation of Title VII of the Civil Rights Act of 1964**

**(Against Defendants JPMorgan Chase, Sullivan, Liasis, Khavin, Shillingford and Does 1-10)**

142.    I hereby repeat, reallege and incorporate each foregoing and subsequent paragraph of this Complaint as though fully set forth herein and further allege as follows:

143.    Throughout my life I had been a high achiever and prior to having racist managers and skip level managers, Defendants Sullivan and Shillingford and Liasis and Khavin respectively, EXHIBIT I which proves that I am capable of producing excellent work were the types of feedbacks I was used to getting and aspired to get for my work.

144.    I joined Sullivan's team on August 20, 2012 and in my January 2013 compensation meeting which I had with Sullivan and Mary Joyce Angioli, the skip level manager prior to Liasis who was reassigned to another department a couple weeks or so prior to this said meeting, Sullivan's exact words to me as it regards my performance for the four months in 2012 that I worked on her team was *"you are not going to get a rating because you have been with the company for less than six months. But, your rating would be Meets (M) with a potential for Meets plus (M+)"*, meaning that in the four months that I worked on her team, my performance exceeded "meets expectation". Even though Sullivan did not give me a rating, she did leave five comments on my 2012 year end performance review reflecting what she had told me verbally. The comments are: Comment # 1: *"Candice is very diligent. She has picked up the confirmation process very quickly and has been a great contributor in the drafting team. She is very focused and completes her work on a timely basis. I expect that as Candice continues to learn the products and becomes more comfortable in*

**COMPLAINT**

*the documentation role she will be able to contribute more effectively to creating efficiencies within our process"* (EXHIBIT G – 2012 Performance Review – "Objective 1" - Page 1), Comment # 2: *"Candice is a very focused worker and I can always depend on her to action her items on time. She continues to grow as a drafter by asking her colleagues questions and it is evident she is becoming more comfortable with the products. She picked up the novation process very quickly and was very dependable when Tom was out of the office. Although novations can be very time consuming, Candice was able to manage this function along with her other tasks"* (EXHIBIT G – 2012 Performance Review – "Objective 2" - Page 1), Comment # 3: *"Candice has a positive attitude and is a pleasure to work with. She is constantly taking on more responsibilities and helping out the team when needed. She often will do this on her own without having to be prompted by her manager."* (EXHIBIT G – 2012 Performance Review – "Objective 3" - Page 2), Comment # 4: *"Candice is very focused and produces quality work on a timely basis."* (EXHIBIT G – 2012 Performance Review – "Strengths and Opportunities" - Page 2) and Comment # 5: *"Candice has been a great addition to the team. She has picked up the drafting process very quickly and produces quality work. She has great focus and is very detail oriented which can be challenging in the current environment. Candice should continue down this path for 2013 and would benefit further by increasing both her product and ISDA documentation knowledge."* (EXHIBIT G – 2012 Performance Review – "Summary Comments" - Page 3)

145.    Four months prior to Sullivan writing these comments on my 2012 year end performance review, I worked in another department at JPMorgan Chase as a temporary consultant. The manager for that department was moving on and after wishing him well via email, this was his email response to me: *"I've been so lucky to have you on my team, your work has been first class! You are always thorough and detailed in whatever you do and at the same time you always meet the deadlines set. I wish you every success in the future. Thanks again and we will keep in touch."* (EXHIBIT I)

**COMPLAINT**

146.    When I got the permanent position at JPMorgan Chase reporting to Sullivan and via email I

informed all the brokers for whom I was managing their accounts that I would be moving on to

another position, I received responses such as, *"you have truly been a delight to work with Candice*

*... Congrats!"* (EXHIBIT I).    The representative for one of JPMorgan Chase's top brokers

responded to my said email saying, *"Being extremely selfish Candice, this news is with much regret.*

*You have managed the JPM accounts better than anyone in the 10 years I have looked after them.  I*

*would be very happy to endorse this to your line manager if you let me know who it is?  Are you*

*staying at JPM?  Thank you SO much for all your help"* (EXHIBIT I).    As requested by this

representative, I passed on her endorsement to my past and future managers.  My past skip level

manager who I mention in # 147 response to this information was *"Fantastic.... I forwarded this to*

*Charlie (Head of Global Commodities Operations) as well."*  My direct manager who had moved

on and who I wrote about in # 145, response to me was *"Congratulations on your new role!  The*

*brokerage team and your clients will clearly miss you as you did an excellent job."* (EXHIBIT I)

147.    I was also highly recommended by my then skip level manager to Mary Joyce Angioli (who

was Sullivan's manager at the time) as a candidate for my position reporting to Sullivan.  With that

said and in light of # 145 and # 146, there should be no surprise that four months into the position

working in Sullivan's group, Michelle Sullivan would be telling me in the presence of Mary Joyce

Angioli that *"your rating would be Meets (M) with a potential for Meets plus (M+)"* as well as

writing those favorable comments on my 2012 year end performance review.

148.    Along with my lifetime of ambition and motivation to be a high achiever and the humbling

encouragement from the comments Sullivan wrote on my 2012 year end performance review, I set

out and was determined to be one of the best and valued addition JPMorgan Chase had made to its

vast workforce in regards to the contribution I was willing to work hard to make to the company -

Bearing in mind that while working as a temporary consultant in the position prior to the one on

Sullivan's team, I championed a major backlog cleanup and organization of account activities for

JPMorgan Chase's top broker and other clients which over the years other JPMorgan Chase employees were not able to do. Thus, the email from the representative of JPMorgan Chase's top broker, *"Being extremely selfish Candice, this news is with much regret. You have managed the JPM accounts better than anyone in the 10 years I have looked after them"* (EXHIBIT I). So, the positive contribution I was able to make to JPMorgan Chase was evident even before I officially became an employee of the firm. Now for the harrowing experience of intentional infliction of career regression and career stagnation on the basis of race in violation of Title VII of the Civil Rights Act of 1964 that I endured starting about six months into my tenure (after Liasis was officially named the skip level manager of the team) at the hands of racist managers who were allowed to rove freely at JPMorgan Chase.

149.    As a management team, Defendants Liasis and Sullivan worked hard to intentionally regress and stagnate my career growth at JPMorgan Chase by minimizing and/or locking down my contributions to the team's process improvement initiatives - Bearing in mind that on more than one occasion Liasis had told me *"you are very driven"* and *"you are a go getter"*. But, as a Black person, for him, I was too ambitious. Compared to the White majority of employees that he managed, I was too "uppity". As he told me, *"you are very professional. You need to tone down your professionalism to integrate with the team."* In other words, I needed to be contained in my "Black hole" (see more in Tenth Cause of Action – "Defamation of Character on the Basis of Race in Violation of Title VII of the Civil Rights Act of 1964").

150.    In the first quarter of 2013 working on Liasis and Sullivan's team, it became increasingly evident to me that there were process deficiencies in the management of query requests which would require more thought and/or time than average to resolve. Because those deficiencies were having a negative impact on productivity, without making mention of my thoughts, I started making small notes and mentally was trying to figure out a design that could make the process more efficient. With that said, it was like an aha-moment when during one of our morning team huddles

(meeting) led by Liasis and Sullivan, Liasis happened to mention that he was soliciting ideas for resolving the deficiencies of the group's query management process. Since one of my objectives per my 2012 year end performance review was *"To master the Confirmations process by finding ways to enhance efficiency, accuracy and turnaround time"* (EXHIBIT G – 2012 Performance Review – "Objective # 1" - Page 1), I thought that Liasis' request for suggestions would have been a great opportunity for me to share my thoughts with my managers and with their support then subsequently with the input of the rest of the team members, as a team, we could develop a mechanism that would enhance the efficiency of the query management process. I excitedly mentioned and gave a brief synopsis of my idea to Liasis who from the get go was obviously not too impressed from the moment I raised my hand in response to his request for suggestions. However, he instructed me to send my idea to him via email which I did but got no response from him whether verbally or in writing. Not even "thank you".

151.    Based on the comments that Sullivan made on my 2012 year end performance review when she was reporting to Mary Joyce Angioli and on Liasis' detection of my *"drive"* and my *"go getter"* attitude, it was obvious that I was a Black employee with ambition and excellent potential. But Liasis, a racist, who must have thought that I was acting "White" (see more in Tenth Cause of Action – "Defamation of Character on the Basis of Race in Violation of Title VII of the Civil Rights Act of 1964") was having no part of that. With help from Sullivan who was now reporting directly to him, I became an ambitious slave who had tried many times to escape from her captivity but kept getting recaptured and punished by her master. It was as if Liasis' main purpose for me was to keep me contained in my "Black hole". With that said, it became evident to me that Liasis was determined not to let my idea to enhance the efficiency of the team's query management process see the light of day.

152.    When I touched base with Liasis again via email with a copy to Sullivan regarding my unanswered email, his lackluster and discouraging response made it obvious to me that he was

**COMPLAINT**

prepared to use whatever power JPMorgan Chase vested in him to keep me "contained". He did however, put a date on his calendar to meet with him for me to discuss the idea further with him.

This date was consistently postponed and postponed until finally, as if to get it over with, a meeting came to fruition. Liasis, in his big shot, impatient and obviously no interest manner and with reference to Shark Tank yes, that TV show, Shark Tank and with ridicule addressed me in regards to my idea saying, "*sell it to me, sell it to me*" as if I was pitching a product to him. Needless to say, this meeting was to no avail so my idea again, was left stagnant.

153.    Over the months, the deficiencies in the query management process persisted. However, no other team member came up with or made an attempt or an effort to come up with an idea or even a suggestion to mitigate or to resolve these deficiencies. And, as managers, neither Liasis nor Sullivan was able to come up with a viable solution for the deficiencies. But, they were hell-bent on quelling my efforts to contribute to the query management process improvement initiative. There was no way that Liasis and Sullivan were prepared to give me credit for not just a suggestion but for a full design complete with how the design works, its functions, its features and its benefits.

154.    In May of 2013, Sullivan went on maternity leave and in her absence Liasis did my 2013 mid-year performance review. And, the comments he wrote about my performance were not only discouraging but they were non-factual. I had to take the opportunity to painstakingly respond to his disparaging comments debunking all the non-factual things he wrote about me on my 2013 mid year performance review (EXHIBIT G – 2013 Performance Review – Pages 5 & 6 - 18-JUL-2013).

154a.    After months of speaking with or, with his "big shot" attitude, pitching to Liasis about my idea to mitigate the deficiencies in the team's query management process to improve the team's productivity and him ridiculing and quelling my efforts to contribute to this process improvement, instead of Liasis mentioning my efforts in contributing to this initiative on my performance review, he unconscionably put on my permanent work record that "*strategically Candice needs to continue to identify how we can meet and exceed our productivity and needs and to identify weaknesses and*

**COMPLAINT**

*gaps in our processes*". My response to Liasis' comment was "*In terms of identifying weaknesses and gaps in the processes, I spent hours of my personal time (after work and on weekends) working on a query management tool (see attachments) which in my humble opinion, I think could enhance efficiency, accuracy, transparency, productivity and turnaround time of the Confirmations process.*"

155.    In addition to Liasis' unsettling comment about my need to "*identify weaknesses and gaps in our processes*" after I had put forth so much effort in doing so, in a future huddle (the team's morning meeting), he deliberately acted as though he was completely oblivious to our discussions about my idea to improve the team's query management process.  As if those discussions never happened and without mention of my effort, he was once again announcing to the team that he was soliciting ideas for resolving the problem of managing the group's query management process.  I immediately realized that Liasis was attempting to stagnate my career growth by quelling my efforts to contribute to process improvement initiatives.  After he made his appeal for suggestions (because by now it had reached "appeal" status), I raised my hand to ask if I could present my idea to the team while reminding him that what I was asking to present to the team was what I had been speaking with him about.  At this point, it was very obvious by his impatient demeanor that he was trying to completely shut down what I was trying to say.  He immediately tried to end the conversation and to move on to another topic to prevent me from having the opportunity to share my idea with the team.  It was a struggle but I was persistent so, I raised my hand again.  It was difficult for him to ignore my persistent, raised hand so I finally was given the opportunity to speak. After I spoke and was able to garner some interest from the team in making a presentation to them, as if he didn't know what I was talking about, Liasis sternly insisted, "*I need to see what you will be presenting to the team.*"  So, in a meeting with him, I showed him what I would be presenting, **again**.

156.    On the day I was permitted to make my presentation, I had provided handouts for each member of the team detailing how the "Query Management Tool" would work, its functions, its